[No. 30462.  Department One.  May 3, 1948.]

H. F. WILLETT *et al., Appellants,* v. ARTHUR H. DAVIS *et al.,*
*Respondents and Cross-appellants.*[1]

[1]Reported in 193 P. (2d) 321.

*Crollard & O'Connor,* for appellants.

*Robert E. Conner,* for respondents and cross-appellants.

HILL, J.—Arthur H. Davis and Edith E. Davis, his wife, hereinafter referred to as the owners, had a store building to which they desired to construct an addition sixty feet by twenty-five feet in size and to install cold storage lockers therein. H. F. Willett and J. T. Babst, doing business under the trade name of Willett & Sons, hereinafter referred to as the contractors, agreed to do the work. The construction and installation of the cold storage lockers was to cost $4,250 on the basis of a lump-sum contract, and the cost of the addition to the building was to be on the basis of the cost of labor and materials plus fifteen per cent. The agreement between the parties was written on a form prepared by the contractors, and by it they agreed

". . . to provide all the materials and perform all the work . . . in accordance with the specifications . . . , and to build and erect said store building addition in a good, substantial and workmanlike manner . . .

" . . . to construct said addition as economically as it is possible to do and still construct a good and substantial building."

The owners agreed to pay

" . . . the actual cost of the labor and materials performed and used in erection of said addition to building as shown by the books of the . . . [contractors], and in addition thereto, a commission at the rate of fifteen percent (15%) on the whole cost thereof as the profit of the . . . [contractors]."

(Whatever argument might have been made on the proposition that the contractors were entitled to a net profit of fifteen per cent has been waived by the contractors, who, by their lien and pleadings, have made it clear that the

fifteen per cent was a "supervision and construction charge.")

The work was completed about December 31, 1946, and a "Notice of Claim for Lien" for labor performed and materials furnished, covering the real property on which the addition had been erected, was filed January 7, 1947, which claim was in the sum of $4,404.07, that being stated to be the unpaid balance on the contract for the construction of the addition to the building.

An action to foreclose the lien was commenced on February 3, 1947, it being alleged therein that surplus materials amounting to $41.54 had been returned to the contractors. Accordingly, judgment was asked in the sum of $4,362.53, together with attorneys' fees of $450 and costs; and it was further asked that such judgment be decreed to be a lien against the real property and, as such, foreclosed.

The trial court, by its judgment and decree entered July 31, 1947, disallowed items totaling $2,180.50 which, with the fifteen per cent charged thereon, made a total disallowance of $2,507.58. The court subtracted this amount from $4,362.53 and gave the contractors a judgment for the difference, $1,854.95, together with interest thereon from January 7, 1947, the date of the filing of the lien.

After the filing of the complaint but before any other proceedings, the owners had made an offer in accordance with Rule of Practice 24, 18 Wn. (2d) 47-a, providing that judgment might be taken against them in the amount of $3,362.53, together with costs to the date of the offer. The offer not having been accepted, and judgment on the items of labor and materials having been recovered only in the sum of $1,854.95, the trial court allowed the contractors an attorneys' fee of only $150, being for services prior to the offer of judgment, and their costs accrued only to that date, in the sum of $8.60. These amounts, together with $63.69 interest computed from the date of the filing of the lien, made a total of $2,077.24. The trial court also allowed the owners a judgment in the amount of $17.20, for their costs accruing subsequent to the offer of judgment, and by this

offset reduced the judgment to $2,060.04, which was declared to be a lien against the property, and the lien was ordered to be foreclosed.

The contractors appealed from the disallowance of items totaling $2,507.58 and from that part of the judgment which allows them an attorneys' fee of only $150 and which limits their costs to $8.60, and from that part thereof which allows the owners the sum of $17.20 as costs. (They now concede that certain items were properly disallowed by the court.) The owners cross-appealed from that part of the judgment granting and foreclosing a lien and allowing interest from the date the lien was filed; they further appealed from the trial court's refusal to grant them an attorney's fee in the sum of $350.

We now come to a consideration of the controversial items as enumerated on p. 12 of the contractors' brief:

A. WAGES PAID TO TWO MEN FOR THEIR SERVICES AS FORE-MEN AND SUPERVISORS, IN THE SUM OF $719.68.

This item was disallowed on the theory that, since these men sawed no boards, hammered no nails, and handled no tools, their services did not constitute labor. Reliance is placed on *Cavanaugh v. Art Hardware & Mfg. Co.*, 124 Wash. 243, 214 Pac. 152, and *Lytle, Campbell & Co. v. Somers, Fitler & Todd Co.*, 276 Pa. 409, 120 Atl. 409, 27 A. L. R. 41.

The latter case is of little assistance to the owners, since the supervision item there disallowed was general supervision by the officers of the contracting company corresponding to the supervision by the partners, Willett and Babst, in this case, which it is conceded should not have been allowed. Any foreman is in a certain sense a supervisor, but the *Lytle* case seems to draw a distinction between supervision on administrative and operative levels. The supervision by Mrachek and Craghead, the two men whose pay is here involved, was definitely on the operative level.

Nor is the *Cavanaugh* case of any assistance here, because, in relying upon it, the owners ignore the fact that this is a contractors' lien and would have us construe only

Rem. Rev. Stat., § 1129 [P.P.C. § 180-1], and disregard Rem. Rev. Stat., §§ 1139 and 1141 [P.P.C. §§ 180-21, -25], which refer to liens of contractors and subcontractors.

These three sections of our lien statute are set out and construed together in *Chavelle v. Island Gun Club,* 77 Wash. 304, 137 Pac. 511. So far as they are material, we will set them forth again:

§ 1129. "Every person performing labor upon or furnishing material to be used in the construction . . . of any . . . building . . . has a lien upon the same for the labor performed or material furnished by each, respectively . . ."

§ 1139. "The contractor shall be entitled to recover upon the claim filed by him only such amount as may be due him according to the terms of his contract, after deducting all claims of other parties for labor performed and materials furnished; . . ."

§ 1141. "In every case in which different liens are claimed against the same property, the court, in the judgment, must declare the rank of such lien or class of liens, which shall be in the following order:—
1. All persons performing labor;
2. All persons furnishing materials;
3. The subcontractors;
4. The original contractor. . . ."

In *Chavelle v. Island Gun Club, supra,* we held that a contractor is entitled to a lien for labor or materials or both, furnished and paid for by him in the performance of his contract, and that

". . . *the amount of his lien is determined by the amount due him according to the terms of his contract* and neither this amount nor the lienability of his claim is affected by the fact that he also agrees to furnish, as part of the consideration for his contract on the given terms, the instrumentalities and tools used in the work and by which the labor is made effective and the materials handled, molded, fitted and adjusted to the work." (Italics ours.)

In that case, the subcontractor, Everett Construction Company, in connection with the building of a dike, was to do the work of dredging and supervising the building of the dike, furnishing its own dredger and operating crew, for

the sum of forty dollars a day. It was held that the subcontractor was entitled to a lien for the unpaid balance of its contract price despite the fact that the services of the dredger must have represented a very substantial portion of that contract price.

■ These three sections of our lien statute were again construed together in *Powell v. Nolan,* 27 Wash. 318, 67 Pac. 712, 68 Pac. 389. We there said:

"The other sections of the statute which we have cited clearly indicate that a subcontractor or contractor is to be regarded as performing labor upon the building, and is entitled to file lien claims therefor the same as laborers and material men, but subordinate to such liens. Construing the act, as we must, so as to give effect to every part thereof, we must hold that the contractor has a lien for the contract price, irrespective of the fact that he performed no service further than overseeing the construction of the building according to his contract."

Since a contractor has a lien for the labor and materials furnished by him in the amount of the unpaid balance of the contract price, there can be no question of this and other items here in dispute if the contractors were attempting to establish a lien for the unpaid balance on a lump-sum contract or on a contract for the cost of construction plus a fixed percentage, as was the case in *Smyth v. Lance & Peters,* 52 Wash. 560, 100 Pac. 995. Here the contract price was "the actual cost of the labor and materials performed and used in erection of said addition to building as shown by the books of" the contractors, and, "in addition thereto, a commission at the rate of fifteen percent (15%) on the whole cost thereof." We are, therefore, confronted with the necessity of determining what these parties meant by the words "labor and materials performed and used in erection of said addition."

■ We disagree with the trial court in its conclusion that the parties meant the words "labor and materials" to have the same meaning that we have placed upon them in our cases construing Rem. Rev. Stat., § 1129. Lien statutes of this character are in derogation of the common law and

will be strictly construed on the issue of whether a lien attaches. *Tsutakawa v. Kumamoto,* 53 Wash. 231, 101 Pac. 869, 102 Pac. 766; *Western Clinic & Hospital Ass'n v. Gabriel Const. Co.,* 168 Wash. 411, 12 P. (2d) 417. Certain of our earlier cases construing Rem. Rev. Stat., § 1129, placed a very strict construction on what constitutes labor and materials (*Armour & Co. v. Western Const. Co.,* 36 Wash. 529, 78 Pac. 1106; *Gilbert Hunt Co. v. Parry,* 59 Wash. 646, 110 Pac. 541, Ann. Cas. 1912B, 225; *Tsutakawa v. Kumamoto, supra*), but it has been liberalized somewhat by our holding in *Ellis-Mylroie Lbr. Co. v. Bratt,* 119 Wash. 142, 205 Pac. 398.

■ In our opinion, the parties did not contemplate the phrase "labor and materials" as having the restricted meaning which we have placed on these words in construing Rem. Rev. Stat., § 1129.

The building was constructed by union labor, and, under union rules, wherever three or more carpenters are employed, there must be a foreman, who is not permitted to use the tools of the trade and whose duties must be directory and supervisory. He plans and lays out the work of the carpenters on the job. Without engaging in any defense of what may have been a feather-bedding practice, we are convinced that the contractors had to employ these foremen to get the building constructed by union labor.

The owners argue, perhaps with tongue in cheek, that it was immaterial to them whether the building was erected by union or nonunion labor, and that, consequently, they should not be charged with an additional cost made necessary because the contractors elected to employ union labor. The argument may be unanswerable from the standpoint of abstract logic, but the law must deal with the practicalities and mores of the time and place, and the owners must be held to have anticipated, if they did not actually know, that union labor would be employed by the contractors in the construction of the building.

We hold that the employment of these foremen was a labor item within the contemplation of the parties to the

contract, and that, regardless of whether their services fell within the very narrow definition of labor adopted by us in the *Cavanaugh* case, *supra,* it was a part of the contract price for which the contractors had a lien. *Powell v. Nolan, supra; Smyth v. Lance & Peters, supra; Chavelle v. Island Gun Club, supra.* This was a lienable item, and its disallowance was error.

B. Labor Paid and Accounted for on Time Sheets Made Up and Signed by the Bookkeeper: $376.48 ($365.52 plus three per cent sales tax amounting to $10.96).

For the most part, the time for which the men working on this job were paid was kept by the foremen, who handed in time sheets each evening. The amount disallowed by the trial court was made up from time sheets signed by the bookkeeper, who worked in the office of the contractors one-half mile from the place where the work with which we are here concerned was being done.

We have, at the expense of considerable time and labor, gone through exhibit No. 12 and picked out all the time sheets signed by the bookkeeper, whose name was McGaughey (and they will hereafter be referred to as the McGaughey time sheets), and analyzed them. They contain the following items:

| | |
|---|---|
| Time credited to Willett and Babst, the members of the contracting partnership | $ 46.50 |
| Use of truck | 124.50 |
| Labor on truck (LaRue and Miller) | 152.25 |
| E. Park (September 9, 10, and 14) | 20.25 |
| J. R. Conrad (September 9, 10, and 14) | 22.28 |
| Total | $365.78 |

(The witness Kellogg testified that the total of the McGaughey time sheets was $365.52, making a discrepancy of twenty-six cents between his figure and ours.)

We have also ascertained, from an examination of all the time sheets, that the $46.50 for time credited to the partners is included in the figures of supervision time totaling $120.01, credited to them, which was disallowed as a separate item and which disallowance has been concurred in by the contractors. (See items Nos. 11 and 12, p. 594.) Its

inclusion in this $376.48 item now under consideration constitutes a double disallowance of the same item, which will not be permitted.

Passing now to the matter of the use of the truck and the labor on the truck, the testimony is that LaRue was a truck driver, and that he each day advised McGaughey of the hours the truck had been used in connection with each of the various construction jobs on which the contractors were then engaged. LaRue's time and the truck time were always identical. Miller apparently was the helper on the truck, and his time, when it appeared on the questioned time sheets, coincided with that of LaRue with the exception of one extra half-hour. The fact that the work of these men and the truck was servicing and carrying materials to numerous jobs, accounts for the fact that the foremen did not report their time.

The trial court allowed truck time as cartage, based on *Brace & Hergert Mill Co. v. Burbank,* 87 Wash. 356, 151 Pac. 803, Ann. Cas. 1917E, 739, and *Siler Mill Co. v. Charles Nelson Co.,* 94 Wash. 477, 162 Pac. 590. The only objection to the allowance of this cartage and labor time apparently is that LaRue did not turn in time sheets showing the truck time and that of Miller and himself, and that McGaughey's time sheets were based upon LaRue's verbal reports to him.

The other two items on the McGaughey time sheets apparently covered some preliminary work on three different days before construction work actually began. The two men involved, E. Park and J. R. Conrad, were the only ones working on this job on September 9th, 10th, and 14th. It appears that their time was reported either personally or by Mr. Babst to McGaughey.

■ The question here presented is whether it was necessary to call LaRue, Miller, Park, and Conrad as witnesses to prove that they worked, and that the truck was used for the time indicated by McGaughey's time sheets, or whether those time sheets in themselves were admissible and competent to prove the time worked by and the amounts paid to these men. Our case of *Pacific Tel. & Telegraph Co. v. Huetter,* 68 Wash. 442, 123 Pac. 607, is apparently decisive

of the question presented. In that case, we upheld the sufficiency of the telephone company's records to show the amount of time worked where the men reported each day, by telephone to a clerk in the company's city office, the number of hours they had worked on each job. The accuracy of the record depended upon the truthfulness of the reports received by the clerk in the city office, and we said:

"That they made truthful reports thereof will be presumed until at least some evidence is introduced to impeach the presumption, of which there is nothing in this record. The record is admissible on the principle that books of account of the ordinary merchant are admissible, because it is the best evidence of which the case in its nature is susceptible."

In that case, we conceded that the weight of modern authority was perhaps against the competency of the proof offered, but we determined to follow the rule which Dean John Henry Wigmore epitomized in the following language:

"The conclusion is, then, that *where an entry is made by one person in the regular course of business, recording an oral or written report, made to him by other persons in the regular course of business, of a transaction lying in the personal knowledge of the latter persons, there is no objection to receiving that entry under the present Exception, verified by the testimony of the former person only, or of a superior who testifies to the regular course of business, provided the practical inconvenience of producing on the stand the numerous other persons thus concerned would in the particular case outweigh the probable utility* of doing so.

"Why should not this conclusion be accepted by the Courts? Such entries are dealt with in that way in the most important understandings of mercantile and industrial life. They are the ultimate basis of calculation, investment, and general confidence in every business enterprise. Nor does the practical impossibility of obtaining constantly and permanently the verification of every employee affect the trust that is given to such books. It would seem that expedients which the entire commercial world recognizes as safe could be sanctioned, and not discredited, by Courts of justice. When it is a mere question of whether provisional confidence can be placed in a certain class of statements, there cannot profitably and sensibly be one rule for the business world and another for the court-room. The merchant and

the manufacturer must not be turned away remediless because methods in which the entire community places a just confidence are a little difficult to reconcile with technical judicial scruples on the part of the same persons who as attorneys have already employed and relied upon the same methods. In short, Courts must here cease to be pedantic and endeavor to be practical." 5 Wigmore on Evidence (3d ed.) 379, § 1530.

The McGaughey time sheets fall well within this rule, and they were admissible and competent to establish that LaRue, Miller, Park, and Conrad worked the hours indicated thereon, and that the truck time was properly chargeable in accordance therewith.

■ The McGaughey time sheets were admissible for still another reason. The owners had agreed to pay "the actual cost of the labor and materials performed and used in erection of said addition to building *as shown by the books of the"* contractors. These were the original records of the contractors and LaRue, Miller, Park, and Conrad had been paid in accordance therewith, and the records were therefore admissible.

True, the owners were not obligated to pay for labor not performed or materials not furnished. However, the McGaughey time sheets being admissible and the owners having agreed to pay the costs as shown by the books of the contractors, the owners had the burden, if they wished to avoid payment of the costs so shown by those books, of proving the inaccuracy of the contractors' books and records, either by cross-examination or by testimony of their own. But they do not here contend that these four men did not work on the days indicated by the McGaughey time sheets, or that they were not paid for that time. They contend only that the contractors have failed to prove that they worked. The owners could not impeach the accuracy of the record made by merely showing that it was based on verbal reports made to the bookkeeper.

We therefore conclude that, since $46.50 of the $376.48 involved in this item was included in other disallowed items, and the remainder was established as labor and

cartage costs, the trial court erred in disallowing this item of $376.48.

C. LABOR CHARGES FOR TIME CREDITED TO MEN IN EXCESS OF THE TIME DURING WHICH THE FOREMEN THEMSELVES WERE ON OR AROUND THE JOB: $83.89.

██ How the figure of $83.89 for this item was arrived at, we have been unable to determine. The actual hours which men worked in excess of the time when the foremen were on the job amounted to at least $500 and probably considerably more; however, the amount is not material. The testimony was that Mrachek and Craghead, who were the foremen and supervisors on this job, were also acting in similar capacities on other jobs which the contractors had in the same vicinity, and that they went back and forth from one to the other, charging each job with part of their time. There is a suggestion in the contractors' brief that this item was for overtime, worked in the absence of the foremen.

It seems to us extremely "pedantic," to use Dean Wigmore's word for it, to say that a foreman cannot tell whether a man is doing an hour's work or a day's work unless he is watching him all the time; or, stating the proposition affirmatively, we hold that it is possible for foremen or others charged with keeping time on a construction job to tell whether a man has worked a certain period of time without actually watching him or being present during the entire period. We find no merit in the owners' position on this item, and it should not have been disallowed.

D. PAYROLL TAXES FOR MEDICAL AID, SOCIAL SECURITY, UNEMPLOYMENT COMPENSATION, AND INDUSTRIAL INSURANCE PAID BY THE CONTRACTORS UPON THEIR EMPLOYEES: $407.25.

It is conceded that the so-called payroll taxes are made up of the following items:

| | |
|---|---|
| Federal social security | .01 |
| State industrial insurance | .018 |
| State medical aid | .008 |
| State unemployment compensation | .027 |
| Total | .063 |

Certain concessions of erroneous assessment of payroll taxes by the contractors are elsewhere taken into account and will not be considered here.

■ The fact that a contractor is required to pay these payroll taxes is so generally known that the owners must have contemplated that they would be included in "the actual cost of labor." The very size of the taxes argues against its being the intention of any contractor operating on a basis of cost plus ten or fifteen per cent to pay out so large a portion of his compensation in taxes of this character. While there is a division of authority on this proposition, we cannot believe that any owner is so naive as to expect, or any contractor so generous as to intend, that the 6.3% of the labor costs involved in so-called payroll taxes would be paid out of the percentage from which the contractor's compensation must come. Supporting our view is the case of *Boat & Barge Corp. v. Beverly Finance Co.*, 71 Cal. App. (2d) 800, 163 P. (2d) 913. In that case, there was an agreement by the finance company to advance " 'the monies necessary to pay for all labor and materials required for the completion' " of certain boats. Taxes for social security, state unemployment, and old age benefits were held to be direct labor charges.

We again call attention to the fact that we are not here construing the word "labor" as it is used in Rem. Rev. Stat., § 1129, for we are here concerned not with a laborer or materialman's lien under that section but with a contractors' lien, and, as heretofore pointed out, a contractor is entitled to a lien for the contract price or the unpaid balance thereof. If the payroll taxes are a part of the contract price in this case, and we hold that they are, then the contractors are entitled not only to recover the payroll taxes paid by them but also to have them included in their contractors' lien.

E. RENTAL OF EQUIPMENT (Compressor, jackhammer, paving breaker, chipping hammer, hose): $157.22.

■ ■ We have always held that, within the purview of Rem. Rev. Stat., § 1129, the rental of equipment is neither labor performed nor materials furnished. *Hall v. Cowen*,

51 Wash. 295; 98 Pac. 670; *Hurley-Mason Co. v. American Bonding Co.,* 79 Wash. 564, 140 Pac. 575. On the other hand, we are fully aware that equipment rental is lienable as "supplies" within the purview of Rem. Rev. Stat., § 1159 [P.P.C. § 180-41] (*United States F. & G. Co. v. E. I. Dupont De Nemours & Co.,* 197 Wash. 569, 85 P. (2d) 1085), that it is part of a contractor's costs and is usually taken into account in cost-plus contracts, and that it is properly considered as part of the whole cost. However, here the owners did not agree to pay the whole cost, but instead agreed to pay "the actual cost of the labor and materials performed and used in erection of said addition"; the "whole cost" referred to in the agreement is obviously the sum of the amount paid for the actual cost of labor and materials. The agreement does not seem to us ambiguous on this point; but, if it is, the construction we have placed upon it is a reasonable one, and, since the contractors prepared the contract, any doubt should be resolved in favor of the owners. *State Bank of Wilbur v. Phillips,* 11 Wn. (2d) 483, 119 P. (2d) 664; *Dorsey v. Strand,* 21 Wn. (2d) 217, 150 P. (2d) 702.

We have heretofore said that the question to be determined with reference to each of these items is whether or not the parties contemplated that it was included in "the actual cost of labor and materials." We have held that the parties must have contemplated the payments to foremen and of payroll taxes as being part of "the actual cost of labor." Applying here the same tests, we find one of the owners testifying, without objection, that he did not contemplate the rental of equipment as being a part of the actual cost of labor; nor do we believe that reasonable men would have contemplated such rentals as being a part of that cost.

The disallowance of this item is sustained.

F. GASOLINE USED IN RENTED EQUIPMENT: $46.43.

Our conclusion on this item is the same as that on the matter of the equipment itself. This may well be a lienable item under a statute giving a lien for provisions and supplies. *National Surety Co. v. Bratnober Lbr. Co.,* 67

Wash. 601, 122 Pac. 337; *United States Rubber Co. v. American Bonding Co.*, 86 Wash. 180, 149 Pac. 706, L. R. A. 1915F, 951; *Standard Oil Co. v. Long-Bell Lbr. Co.*, 166 Wash. 156, 6 P. (2d) 402; *United States F. & G. Co. v. E. I. Dupont De Nemours & Co., supra.* It is unquestionably a part of the whole cost; but, in the purview of the lien statutes, or the interpretation which reasonable men would have placed upon the agreement, it must be held that it is neither labor nor materials used in the construction of the building. The disallowance of this item is likewise affirmed.

G. ELECTRICAL INSTALLATION AND WIRING CHARGED AGAINST THE OWNERS FOR THE CONTRACTORS' USE DURING CONSTRUCTION: $80.67.

It appears from Mr. Willett's own testimony that an electrical installation had been made to furnish light inside the building; but, as he said, "We needed more lights after we started setting up the lockers and that little service wouldn't carry the power." It was to meet this need for increased power and illumination in connection with the work on the lockers that a second installation costing $69.09 was made on December 1, 1946. That item, on Mr. Willett's testimony, was clearly chargeable not to the construction contract involved here but to the locker contract, and it was properly disallowed. The testimony as to the purpose of the original installation on October 31, 1946, costing $11.58, was in conflict, but inasmuch as one of the owners testified that it was for locker construction only, the trial court had the right to believe him; therefore, the disallowance of the entire amount of $80.67 will be affirmed.

Summarizing on the contractors' appeal, we find that the following deductions should be made from the $4,362.53 claimed to be due and owing to them: (We here use the numbers and phraseology used in the decree in enumerating the deductions there made.)

| | Deductions by Trial Court | Deductions Conceded | Deductions Approved by Supreme Court | 6.3% Payroll Tax | 3% Sales Tax | Total Amount to be Deducted |
|---|---|---|---|---|---|---|
| (1) Taxes for medical aid, social security, unemployment compensation, and industrial insurance charged by plaintiffs (contractors) upon plaintiffs' employees and equipment rental ........ | $407.25 | $11.68① | $11.68 | $ .... | $.... | $ 11.68 |
| (2) Rental of equipment employed by plaintiffs ..... | 157.22 | ..... | 157.22 | 5.51② | 4.72 | 167.45 |
| (3) Wages of William Mrachek, foreman and supervisor .... | 494.68 | ..... | ..... | .... | .... | ..... |
| (4) Wages of Clarence Craghead, foreman and supervisor | 225.00 | ..... | ..... | .... | .... | ..... |
| (5) Labor charges accounted on time slips signed by Joseph McGaughey ..... | 376.48 | ..... | ..... | .... | .... | ..... |
| (6) Electrical installation and wiring charge for plaintiffs' use during construction .. | 80.67 | ..... | 80.67 | .... | 2.42 | 83.09 |
| (7) Sharpening gads ......... | 9.50 | ..... | 9.50③ | .... | .29 | 9.79 |
| (8) Overtime charged on trucks ....... | 20.13 | 20.13 | 20.13 | 1.27 | .60 | 22.00 |
| (9) Gasoline used in rented equipment ... | 46.43 | 3.37 | 46.43 | .... | 1.39 | 47.82 |
| (10) First aid equipment ... | 1.24 | 1.24④ | 1.24 | .... | .04 | 1.28 |
| (11) Supervision time of H. F. Willett ...... | 88.76 | 88.76 | 88.76 | 5.59 | 2.66 | 97.01 |
| (12) Supervision time of J. T. Babst ....... | 31.25 | 31.25 | 31.25 | 1.97 | .94 | 34.16 |

| | Deductions by Trial Court | Deductions Conceded | Deductions Approved by Supreme Court | 6.3% Payroll Tax | 3% Sales Tax | Total Amount to be Deducted |
|---|---|---|---|---|---|---|
| (13) For bookkeeping service and office rent ........ | 158.00 | 108.00 | 108.00⑤ | 3.65⑤ | 3.24 | 114.89 |
| (14) Labor charges accounted by foremen above the hours actually worked by foremen on individual days shown.. | 83.89 | ..... | ..... | .... | .... | ..... |
| Total ......| 2,180.50 | 264.43 | 554.88 | 17.99 | 16.30 | 589.17 |
| (15) Fifteen per cent charged on above items on which deductions are approved ....................................... | | | | | | 88.38 |

Total amount to be deducted...................... $677.55

① Other payroll taxes totaling $25.58 in addition to this $11.68 for taxes on use of truck were conceded, but they have been taken into account elsewhere.

② Payroll taxes charged on only $87.50 of item.

③ Sharpening gads is not included by the contractors in either the conceded items on p. 36 of their brief or the contested items on p. 12. Passing reference only is made to it in their discussion of equipment rental. We assume, therefore, that the contractors regarded this item in the same category as rental equipment, and we have disposed of it accordingly.

④ Not expressly conceded, but not included in contested items set out on p. 12 of the contractors' brief.

⑤ We find no evidence that more than $108.00 was charged against this job for bookkeeping and office rent. Payroll taxes were charged on only $58.00 of this item.

This leaves a balance of $3,684.98 for which the contractors are entitled to have their lien foreclosed, exclusive of interest, attorneys' fees, and costs.

The amount which the contractors are entitled to recover being in excess of the offer of judgment made by the owners, the trial court's action in limiting the contractors' attorneys' fee to the services which had been rendered before the offer of judgment was made was erroneous, as was its action in allowing costs to the owners in the sum of $17.20.

We turn now to the owners' cross-appeal. The argument on the first three points raised: (1) that there should be no lien because of bad faith in commingling a large number of nonlienable with lienable items, (2) that

interest should be allowed not from the date of the filing of the lien but only from the date of the judgment, and (3) that the owners should have been allowed an attorney's fee of $350, is predicated in large part on the fact that the judgment by the trial court disallowed items aggregating $2,507.58 and allowed a recovery on items aggregating only $1,854.95 of the $4,362.53 claimed. Their argument is further premised on the proposition that the offer of judgment exceeded the amount actually recovered. Our holding on the issues raised by the contractors' appeal has changed that situation completely, and the argument on those three points is now without any substantial foundation. There was no evidence of such fraudulent commingling of lienable and nonlienable items by the contractors as might deprive them of their lien right, and there was no such uncertainty here as would deprive the contractors' claim of its status as a liquidated claim.

The owners' final contention on their cross-appeal is that exhibit No. 4, carbon copies of monthly statements furnished by the contractors to the owners, should not have been admitted in evidence. They were objected to on the following grounds:

"Not original entries, not the best evidence, and apparently Mr. Crollard has with him the statements and the invoice upon which this is based."

The owners in their brief urge

". . . that purported copies of original papers in the possession of the opposing party may not be admitted in evidence over objection unless preceded by a demand for production of the originals made before the trial."

If there was any error in the admission of exhibit No. 4, it clearly was not prejudicial. This was a recapitulation of all of the separate items set forth in exhibits Nos. 5 to 12, inclusive, and should have been of material assistance to the parties and to the court. In fact, if "recaps" showing the details of certain deductions claimed in the items we have discussed under B and C, *supra*, with appropriate reference to the supporting exhibits, had been furnished, they would have saved many hours of labor in this court.

We find no merit in any contention made on the owners' cross-appeal.

Although it appears that in this case the contractors have charged their fifteen per cent on the three per cent sales tax, being the

". . . charge made for tangible personal property consumed and for labor and services rendered in respect to . . . the constructing . . . of new . . . buildings or other structures . . . upon . . . real property of or for consumers . . ." Rem. Supp. 1945, § 8370-5(d),

which they collected from the owners for the state, the propriety of such a charge is not raised on this appeal and is not passed upon here.

On the contractors' appeal, we affirm in part and reverse in part the judgment appealed from and remand it to the superior court with instructions to enter judgment in favor of the contractors in the amount of $3,684.98, with interest thereon from January 7, 1947, and to allow them their costs and, as part of their costs, "a reasonable attorney's fee in the superior and supreme courts" (Rem. Rev. Stat., § 1141), all of which is to be established as a lien and enforced upon the property described in the judgment.

MALLERY, C. J., MILLARD, and SCHWELLENBACH, JJ., concur.

SIMPSON, J., dissents.