**RAYONIER, INCORPORATED,**
**Appellant,**

**v.**

**F. Arnold POLSON, Appellee.**

**No. 21121.**

United States Court of Appeals
Ninth Circuit.

Aug. 5, 1968.

ity. But the registrant is not required to agree. His right to decline to agree is protected. 32 C.F.R. § 1660.20(c) and (d).

Judgment modified and as so modified affirmed.

Douglas P. Beighle (argued) of Holman, Marion, Perkins, Cole & Stone, Seattle, Wash., for appellant.

Richard Howard (argued) of Ryan, Askren, Carlson, Bush & Swanson, Seattle, Wash., for appellee.

Before BARNES, HAMLIN and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

This is an appeal by Rayonier, Inc.[1] from an adverse judgment in an action brought in the United States District Court by F. Arnold Polson to recover damages for the alleged wrongful cutting and removal of timber. Jurisdiction of the district court was rested upon diversity of citizenship of the parties.

During 1947, Polson and one Cleveland Jackson, now deceased, entered into a joint venture to buy and sell timber and timberland in and near the Quinault Indian Reservation in Western Washington. Jackson's position as Chief of the Quinault Indian Tribe made it advantageous for him to deal with the Indians and he did the purchasing while Polson provided the money.

In 1951 Jackson purchased for the venture the undivided one-half interest of Wallace Bumgarner in property known as the Bumgarner Allotments.

This property had been set aside by the government for two Quinault Indian children, Jean and Shirley Bumgarner; on their death during minority their interests passed in equal shares to their parents, Wallace and Nina Bumgarner. Wallace, a non-Indian, had thereupon received a patent for his one-half but, since Nina was an Indian, the government continued to hold hers in trust.

In January 1960, shortly after Nina entered into contract with Rayonier, Inc. to sell to it her interest in the merchantable timber on the Bumgarner Allotments, Jackson executed a similar contract purportedly on behalf of the joint venture.[2] Rayonier, Inc. commenced logging in January 1961 and by July had cut and removed substantiall· all timber from the property.

Thereafter in August 1962 Polson commenced this suit against Rayonier. His claim in substance was that Jackson lacked authority to sell the timber and that its removal by Rayonier was wrongful. He asserted his claim in the alternative under two Washington statutes, one of which, Wash.Rev.Code Ann. § 64.-12.030, authorizes the allowance of treble damages for timber trespass and the

---

1. Rayonier is a corporation organized under Delaware law and with its principal place of business in New York. Among its activities Rayonier carries on extensive timber purchasing and cutting on the Quinault Indian Reservation, pursuant to a master timber cutting contract it executed in 1952 with the Superintendent of the Western Washington Indian Agency. Under that contract, which was known as the Crane Creek contract, Rayonier agreed to purchase on stated terms and conditions all merchantable timber located on trust allotments in the Crane Creek cutting unit of the Quinault Indian Reservation that were offered for sale by the Indian owner to Rayonier. The contract gave Rayonier in effect a monopoly over the cutting of timber on the Indian land until 1986.

2. The contract between Nina Bumgarner and Rayonier was entered into pursuant to the terms of the Crane Creek contract. See note 1 supra. The contract was actually executed by Mr. Libby, the acting Superintendent of the Western Washing-

ton Indian Agency, on behalf of Nina Bumgarner. The contract was the result of a prolonged period of negotiation among the Superintendent, Nina Bumgarner, Rayonier and Jackson. Nina had wished to find a way to realize on her interest in the property for many years but, because she owned only an undivided one-half interest, the marketability of her interest proved difficult without the agreement of the owner of the other one-half interest. Although the principal value of the land was in its timber, it was first necessary to acquire the agreement from the owners of the other undivided one-half interest in order to place Nina Bumgarner's interest under the Crane Creek contract and for a number of years the owners had refused to allow their interest to be cut. Finally in July of 1959, Jackson purported to give such agreement and the contract between Nina Bumgarner and Rayonier followed. The formal contract between Jackson and Rayonier was executed in January 1960.

other, Wash.Rev.Code Ann. 64.12.020, treble damages for waste.

The district court, sitting without a jury, found the issues for Polson under the trespass statute [3] and, pursuant to a stipulation that the joint venture damages were $23,000, entered judgment for Polson in treble this amount together with interest at the legal rate on the single damages from the date of trespass, less an offset.[4] The net judgment was $54,530.72 plus costs.

Rayonier, Inc. does not seriously contend that Jackson possessed actual authority to make a binding contract. The evidence was undisputed that in 1953 Jackson had signed a formal declaration of trust in which he stated that he held the interest in the Bumgarner Allotments as trustee "without power to sell, exchange, convey, mortgage, or otherwise encumber the same or contract in respect thereto except in accordance with the terms of said [1951 joint venture] agreement. * * *" And the joint venture agreement provided that no valid contract could be made except with the consent of both parties. Polson had never given such consent.

Rayonier does, however, vigorously contend that Cleveland Jackson, as a member and manager of the joint venture, possessed inherent and apparent authority to enter into the contract on its behalf. See Restatement (Second) of Agency §§ 8, 8A (1958). It argues that Jackson was simply carrying on the business in the usual way and that therefore the joint venture was bound. See Wash. Rev.Code Ann. § 25.04.090(1).

A joint venture is in the nature of a partnership and, under Washington law, the relations of the parties in each of those associations are so similar that they are generally tested by the same rules [Paulson v. McMillan, 8 Wash.2d 295, 298, 111 P.2d 983, 984 (1941); Barrington v. Murry, 35 Wash. 2d 744, 752, 215 P.2d 433, 438 (1950); Wash.Rev.Code Ann. § 25.04.060]; thus a member of a joint venture, like the member of a partnership, is deemed to be the agent of the others when he is carrying on its business in the usual manner, even though he lacks actual authority to do so. Wash.Rev.Code Ann. § 25.04.090(1). However, if his authority is limited and the party with whom he is dealing knows of the limitation, then the partnership or joint venture is not bound by his unauthorized action [Wash. Rev.Code Ann. § 25.04.090(4)]; and knowledge of a fact exists " * * * not only when [the party] has actual knowledge thereof, but also when he has knowledge of such other facts as in the circumstances shows bad faith." Wash. Rev.Code Ann. § 25.04.030(1); Lamb v. General Associates, Inc., 60 Wash.2d 623, 627–628, 374 P.2d 677, 680 (1962).

The district court did not err in concluding that Rayonier knew or ought to have known of Jackson's lack of authority. There was substantial evidence, not only that Rayonier knew that the property belonged to the joint venture but also that Rayonier knew of the terms of the joint venture agreement.[5] Moreover, the limitations on Jackson's authority had been specifically pointed

---

3. In addition, the district court judge held: "However, if on appellate review it should be determined that the action does not lie in trespass, I find that it should and does lie in waste." In view of our disposition of this appeal we need not consider this alternative basis for recovery.

4. The offset consisted of the funds which Rayonier had paid to Jackson's estate pursuant to the Rayonier-Jackson contract and which, as a result of a settlement agreement between Polson and Anna Jackson, executrix of Jackson's estate, had been placed in escrow pending the outcome of the present action. See

discussion re ratification infra at 10–11.

5. It is admitted that Rayonier had a copy of the agreement as early as 1954 and that L. J. Forrest, a Vice President of Rayonier who helped negotiate the Rayonier-Jackson contract, had read the agreement prior to the execution of that contract. In addition, the evidence indicates that Rayonier's employees had discussed the significance of the fact that the property was subject to the joint venture agreement prior to the execution of the Rayonier-Jackson contract.

out to Rayonier on an earlier occasion. In 1954 Jackson and Rayonier negotiated a letter of intent involving rights of way over joint venture property, including the Bumgarner Allotments. Upon learning of this, Polson sent a registered letter to Rayonier stating: "Cleveland Jackson holds title as trustee only and was without power or authority to contract in respect thereto except in accordance with the terms of the 1951 joint venture agreement." He added that Jackson's action was unauthorized; that he, Polson, was one of the beneficiaries of the trust agreement and should be consulted with respect to the property. On this evidence the district court was justified in concluding that Rayonier was not in a position to assert in good faith that Jackson had inherent or apparent authority to execute the timber cutting contract.[6]

Rayonier additionally contends that the district court erred in not holding that Polson ratified the Rayonier-Jackson contract.

 Ratification is the affirmance by a person of a prior unauthorized act, whereby the act is given effect as if originally authorized by him. Restatement (Second) of Agency § 82 (1958); Dorsey v. Strand, 21 Wash.2d 217, 230, 150 P.2d 702, 709 (1944). Such affirmance can be established by any conduct manifesting an election to treat an unauthorized act as authorized or conduct justifiable only if there were such an election. Restatement (Second) of Agency §§ 83, 93 (1958). Conduct which may be held to manifest an election to affirm an unauthorized contract includes the failure to repudiate the contract [Restatement (Second) of Agency § 94 (1958); Tobias v. Towle, 179 Wash. 101, 105, 35

P.2d 1114, 1116 (1934) aff'd on rehearing, 179 Wash. 101, 41 P.2d 1119 (1935)], as well as affirmative acts which can be justified only if there were an election to authorize the contract. Restatement (Second) of Agency §§ 97, 98 (1958). Rayonier argues that Polson is bound both because of his long delay before repudiating the contract and because of various affirmative acts.

 Although Jackson and Rayonier executed the contract in January 1960, Polson did not object to it until July 1962, a period of over two years. However, the mere passage of time does not necessarily operate to establish ratification. Restatement (Second) of Agency § 94, comment a at 244 (1958). In order to infer an election to ratify a contract it is, of course, necessary that the party to be charged have full knowledge of all material facts [Dorsey v. Strand, 21 Wash.2d 217, 230, 150 P.2d 702, 709 (1944); Restatement (Second) of Agency § 91 (1958)]; in the present case a considerable dispute existed concerning when Polson first acquired such knowledge.

To evaluate properly when Polson first acquired full knowledge it is necessary to understand the circumstances which followed the execution of the Rayonier-Jackson contract. At no time during or after the execution of that contract in January 1960 did Jackson or Rayonier communicate with Polson about it. When Cleveland Jackson died in November of 1960 Rayonier dealt solely with his executrix Anna Jackson, made all payments to Jackson's estate, and continued to neglect or avoid contacting Polson. Moreover, Jackson's death left the affairs of the joint venture in considerable confusion. Shortly before Jackson's

---

6. Moreover, Rayonier's contention that the execution of timber cutting contracts was part of the "usual" business of the joint venture does not appear to be supported by the record. It is true that Jackson had purchased some property which was already subject to timber cutting contracts; however, it appears that the execution by Jackson of the Rayonier-Jackson timber cutting contract was a unique endeavor, rather than part of the usual business of the joint venture. We also note that Jackson was on a $400 per month retainer with Rayonier at the time he executed the Rayonier-Jackson contract.

death Polson had asked his attorneys to "check into" the holding of the joint venture. This investigation continued for well over a year after Jackson's death; it disclosed that Jackson was guilty of embezzlement and that he had violated his fiduciary duties in many other ways. However, it proved difficult to untangle the complex affairs of the joint venture. In addition, title to various joint venture properties, including the one-half interest in the Bumgarner Allotments, was the subject of dispute in the probate of Jackson's estate, until July 12, 1961, when title was finally determined. By that time Rayonier had substantially completed its logging operations. Polson was then in the difficult position of trying to preserve the proceeds of the contract, which had been paid to Jackson's estate, while establishing whether he, Polson, was bound by Jackson's acts. Investigation continued through the remainder of 1961 and early 1962; in July of 1962 Polson notified Rayonier that its contract with Jackson was unauthorized, and in August Polson commenced this action.

▆▆▆ The district court found that Polson did not acquire full knowledge of all material facts until July 1961. In view of the evidence we cannot say that this finding was clearly erroneous. However, Rayonier points out that more than a year elapsed after Polson acquired such knowledge before he objected, and argues that this prolonged delay constituted ratification. The mere fact that Polson had knowledge for such a period does not necessarily establish ratification; rather, the delay must have been such that under the circumstances an inference of an election to ratify the contract was required. Restatement (Second) of Agency § 97, comment *a* at 244 (1958). The district court, however, concluded that Rayonier had failed to sustain its burden of proving "that Polson's failure to inform Rayonier that

Jackson's conduct was unauthorized was unreasonable under the circumstances." The evidence likewise supports this conclusion.

▆▆▆ Rayonier also contends that by his affirmative actions Polson ratified the contract. These particular acts were: first, Polson's filing of a creditor's claim with Jackson's estate in June 1961; second, several oral demands made by Polson's attorney on Jackson's executrix, Anna Jackson, during 1961 and 1962; third, Polson's filing a suit against Anna Jackson; finally, a settlement agreement entered by Polson and Anna Jackson.

We cannot say that the district court erred in not holding that any of these acts constituted an election to affirm the contract.

First, the creditor's claim was ambiguous with respect to the source of the moneys that gave rise to the claim. Nowhere did the claim specify or even mention the Rayonier-Jackson contract. It was merely a general claim for money received by Jackson from the sale of timber on joint venture lands, and the evidence revealed that there were a number of contracts for such sales which admittedly were valid and binding on Polson. Moreover, Polson's attorney who prepared the claim testified that it did not embrace the proceeds of the Rayonier-Jackson contract. On this evidence the trial judge was not compelled to find a ratification.[7]

Second, there was evidence that the various oral "demands" made during 1961 and 1962 by Polson's attorney on Jackson's estate with respect to the proceeds of the contract were not intended to constitute an approval of Jackson's action, but instead were part of Polson's attempt to maintain the status quo. Polson feared that Anna Jackson might dissipate the funds before it could be finally determined to whom the proceeds

---

7. We need not decide whether the mere filing of a proper creditor's claim neces-sarily constitutes an acquiescence in the decedent's wrongful conduct.

properly belonged. The court was justified in concluding that the so-called demands were essentially requests to preserve the funds pending such a final determination.

■ Third, Rayonier claims that the suit commenced by Polson against Anna Jackson, individually and as executrix of Jackson's estate, was in part to secure judgment for the proceeds of the unauthorized contract. Under normal circumstances the bringing of such a suit would constitute ratification [Restatement (Second) of Agency § 97 (1958)]; however, the situation revealed in this case was not the usual or ordinary one. Polson's suit against Anna Jackson was filed on February 15, 1963, long after his suit against Rayonier; therefore, it could hardly be said to manifest an affirmance of the contract. Moreover, we see no reason why Polson could not protect himself against an adverse judgment in this case by filing a subsequent action against Jackson's estate. See Restatement (Second) of Agency § 97, comment *b* at 251 (1958).

■ Finally, the suit against Anna Jackson culminated in a settlement agreement by which the proceeds of the Rayonier-Jackson contract were placed in escrow pending the outcome of the present litigation. Rayonier claims that by this settlement agreement Polson exercised dominion over the proceeds of the contract and therefore should have been held to have ratified the contract. See Restatement (Second) of Agency § 98 (1958). However, the settlement agreement provided in essence that Polson was to receive the proceeds only if he were unsuccessful as against Rayonier, and conversely would not receive the proceeds if he were successful. Thus the settlement agreement appears to be an attempt to preserve the proceeds of the contract pending the outcome of this litigation. On this evidence the trial judge was jus-

tified in concluding that Rayonier had not established ratification thereby.

Rayonier also contends that Polson was estopped from questioning the validity of the Rayonier-Jackson contract under the well settled principle that "If one maintains silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to have remained silent." Harms v. O'Connell Lumber Co., 181 Wash. 696, 700, 44 P.2d 785, 787 (1935); Huff v. Northern Pacific Railway Co., 38 Wash. 2d 103, 114–115, 228 P.2d 121, 128 (1951).

Of course Polson cannot be faulted because of his failure to object prior to July 1961, for as already noted the trial court found on substantial evidence that until that date he lacked essential knowledge. Consolidatd Freight Lines, Inc. v. Groenen, 10 Wash.2d 672, 677–678, 117 P.2d 966, 968, 137 A.L.R. 1072 (1941); Blanck v. Pioneer Mining Co., 93 Wash. 26, 34, 159 P. 1077, 1080 (1916). Since by that date Rayonier had removed substantially all the timber, Polson's objection thereafter would not have saved Rayonier from any liability.

■ It is true that, during the intervening period of more than a year between the time Polson acquired full knowledge and the time he brought this suit, Rayonier made a number of substantial payments on the contract to Jackson's estate.[8] To that extent, Rayonier suffered a loss. But the court below, finding that "Rayonier had absolutely no right to make these payments other than to Polson; that Rayonier not only had *constructive or implied knowledge* thereof, but that responsible officers of Rayonier *actually knew*, or in the exercise of concern for the rights of others should have known, that those payments under the relationship between Jackson and Polson were to be made to or at the

---

8. It appears that Rayonier paid $12,214.81 to Cleveland Jackson's estate in July and August of 1961. However, Rayonier was given a credit for the full amount of money paid to Jackson's estate pursuant to the Rayonier-Jackson contract.

direction of Polson," [9] held that no estoppel arose. This was correct. One who seeks to invoke the equitable doctrine of estoppel must himself have been free of fault. Kozak v. Fairway Finance-Seattle, Inc., 60 Wash.2d 500, 504, 374 P.2d 1011, 1013–1014 (1962); 28 Am.Jur.2d Estoppel and Waiver § 79 (1966). The Washington Supreme Court recognized this essential requirement in West Coast Airlines, Inc. v. Miner's Aircraft & Engine Service, Inc., 66 Wash.2d 513, 520, 403 P.2d 833, 837 (1965), when it pointed out that the party asserting estoppel "failed to show either the blamelessness or the reasonable conduct necessary to assert estoppel."

Rayonier next contends that the Washington timber trespass statute, Wash. Rev.Code Ann. § 64.12.030, on the authority of which the district court trebled the damages, was inapplicable under the facts of this case. That statute provides in relevant part that:

> "Whenever any person shall cut down * * * or carry off any tree, timber or shrub on the land of another person * * * without lawful authority, in an action by such person * * * against the person committing such trespasses * * *, if * * * judgment be given for the plaintiff, it shall be given for treble the amount of damages claimed or assessed therefor, as the case may be."

Relying on its timber cutting contract with Nina Bumgarner,[10] Rayonier argues that two of the essential statutory requirements were not met because the timber was neither cut "without lawful authority" nor was it situated "on the land of another." [11] We disagree with Rayonier on both points.

9. The 1951 joint venture agreement provided that "all proceeds thereof [from logging contracts] as received shall be paid to Polson." In addition, upon Jackson's death the agreement provided that Polson was to take over as trustee of all the property and all funds were to be received by him and then distributed pursuant to the agreement.

10. Rayonier's argument rests on the premise that its contract with Nina Bumgarner was valid. However, the district court concluded that "Mr. Libby [the acting Superintendent of the Western Washington Indian Agency] did not have authority to authorize a contract without the approval of Polson, which approval was not obtained." We believe this conclusion was correct. At the time the timber cutting contract between Nina and Rayonier was executed, the procedure of the Bureau of Indian Affairs of the Department of Interior required that the agreement of all the co-owners was necessary before a contract could be properly executed [See Act of June 25, 1910, ch. 431, § 7, 36 Stat. 857 as amended 25 U.S.C. § 406 (1964); 65 Decs. U.S.Dept.Interior 101 (1958); Barclay v. United States, 166 Ct.Cl. 421, 333 F.2d 847, 859 (1964)] and, as the district court found, Polson's consent was never obtained. Thus, as has previously been held: "Even if approval is given by an agent of the Bureau the sale is void if the agent had no approval power. United States v. Watashe, 102 F.2d 428 (10th Cir. 1939)." Bacher v. Patencio, 232 F.Supp. 939, 941–942 (S.D.Cal.1964). See also United States v. Eastman, 118 F.2d 421 (9th Cir. 1941).

It is interesting to note that the requirement that the consent of all the owners of the land be obtained before a timber cutting contract could be executed proved to be so burdensome that amendments were proposed and adopted in 1964. Those amendments provided in part that the sale of timber was authorized upon the request of the owners of a majority Indian interest in the land. 25 U.S.C. § 406 (1964). In explaining the need for the amendment John A. Carver, Jr., Assistant Secretary of the Interior, stated that:

> "The 1910 Act permits a sale of timber from allotted land to be made only when the signatures of all of the owners can be obtained. When there are many owners of undivided interests, it is sometimes impossible to comply with this requirement, and compliance is frequently more costly than warranted." 1964 U.S.Code Cong. & Ad. News, p. 2164.

11. Rayonier also asserts that the timber trespass statute contemplates the commission of a common law trespass which, it contends, is generally limited to the wrongful entry by a stranger to the property. Thus it asserts that the statute would generally not apply to a cotenant or his licensee. In pressing this construction of the statute Rayonier first

■ The well settled general rule, followed in Washington, is that one cotenant of real property may use and enjoy the entire property to the fullest extent consistent with the ordinary manner of deriving profits from property of like character [See Comment, The Inter Vivos Rights of Cotenants Inter Se, 37 Wash. L.Rev. 70 (1962)] and he may grant to other persons freely and without the necessity of the consent of his cotenants, his interest in the property and whatever rights he enjoys. De La Pole v. Lindley, 131 Wash. 354, 23) P. 144 (1924); Freeman, Cotenancy & Partition § 253 (2d ed. 1886). For example, in the *De La Pole* case a lessee of agricultural land was held not a trespasser as against his lessor's cotenant, although he was required to account to her for her aliquot share of the wheat crop he had raised.

■ However, a cotenant's right of enjoyment of the common property extends only to the products of its proper use and not to a taking of the land itself. See Shepard v. Pettit, 30 Minn. 119, 14 N.W. 511 (1883); Nevels v. Kentucky Lumber Co., 108 Ky. 550, 56 S.W. 969 (1900); Freeman, Cotenancy & Partition § 299 (2d ed. 1886). "In Washington, standing timber owned by the owner of the real property upon which it is growing has always been regarded as real property." R. Johnson, Washington Timber Deeds and Contracts, 32 Wash.L. Rev. 30 (1957). Engleson v. Port Crescent Shingle Co., 74 Wash. 424, 133 P. 1030 (1913); France v. Deep River Logging Co., 79 Wash. 336, 140 P. 361 (1914). Courts generally hold that a cotenant has no right to remove substantial amounts of timber from land having a value primarily for its timber and that to do so constitutes waste for which he is liable. E. g., Provident Life & Trust Co. v. Wood, 96 W.Va. 516, 123 S.E. 276, 41 A.L.R. 570 (1924); Nevels v. Kentucky Lumber Co., 108 Ky. 550, 56 S.W. 969 (1900); Graybiel v. Burke, 124 Cal.App.2d 255, 268 P.2d 551 (3d Dist. 1954). See generally 2 H. Tiffany, Real Property § 651 (3d ed. B. Jones 1939); Annot. 2 A.L.R. 993 (1919); Annot., 41 A.L.R. 582 (1926).

Washington appears to have adopted this rule in Crodle v. Dodge, 99 Wash. 121, 168 P. 986 (1917). That was a suit by one of several heirs to establish her

points out that the Washington courts have indicated that the statute is penal in nature and therefore should be strictly construed. Rayonier then asserts that, since the acts described in the statute to be penalized are very similar to the common law action for trespass and those acts are actually referred to as "such trespasses" in the statute, the statute should be construed to contemplate a common law trespass.

We cannot agree with Rayonier's interpretation of the statute. It is not at all clear what is required for a "common law trespass;" however, the use of the phrase "such trespasses" in the statute is coupled directly with and in fact merely refers to the specific acts which are previously described in the statute. Some of these acts would not necessarily have constituted common law trespasses [Simons v. Wilson, 61 Wash. 574, 575, 112 P. 653, 654 (1911)], and certainly the treble damage recovery provided by the statute was not contemplated at common law. The Washington legislature clearly had particular evils in mind when it enacted the treble damage statute and the legislature was not satisfied to limit recovery either to a common law form of action or a common law standard of recovery.

Since the statute clearly describes the statutory acts which constitute "such trespasses," we believe it would be improper statutory construction to require a common law trespass [See, e. g., Traxler v. State, 96 Okl.Cr. 231, 251 P.2d 815 (1952); Knudson v. Jackson, 191 Iowa 947, 183 N.W. 391 (1921). See generally 3 Sutherland, Statutory Construction § 5303 at 9–11 (3d ed. 1943); 50 Am.Jur., Statutes, § 262 (1956)]; rather, we conclude that "such trespasses" in the statute was used merely in the more general sense of trespass—i. e., "doing of an unlawful act or of lawful act in unlawful manner to injury of another person or property" [Black's Law Dictionary 1674 (4th ed. 1951)]—and the unlawful acts which are contemplated by the statute are specifically delineated therein.

title to and interest in 160 acres of agricultural and timber land which had been in the exclusive possession of the grantee of the other heirs for many years following the death of the ancestor who was the source of their title. The court concluded that the plaintiff's claim was valid but declined on equitable grounds to order the grantee to render an accounting for the use of the property; however, noting that the grantee was removing timber from the land, the court said:

> "As to the timber, however, a different rule should apply. Its removal amounted to waste and, as the plaintiff moved seasonably in the premises, we perceive no reason why she should be denied the right of asserting her claim in this respect. The trees were a part of the realty and the plaintiff should not be deprived of any part of her inheritance."

99 Wash. at 133, 168 P. at 990.

Rayonier's reliance upon Buchanan v. Jencks, 38 R.I. 443, 96 A. 307, 2 A.L.R. 986 (1916) is misplaced. It is true that in that case the court held the licensee of one cotenant not liable to the other cotenants for treble damages under a timber-trespass statute. But in Rhode Island, timber is not regarded as part of the land as it is in Washington, but rather is held to be like grain or other crops and hence a profit which may be removed without harming the land itself. The Rhode Island court made clear this fundamental distinction when it said: " * * * if the cutting and removal of the ripe product of the lot was a destruction of some portion of the corpus of the estate, there is ample author-

ity for holding that the defendant, although standing in the place of a cotenant, would be liable * * *." Buchanan v. Jencks, 38 R.I. 443, 448–449, 96 A. 307, 310, 2 A.L.R. 986 (1916).

 Since Nina Bumgarner could not herself remove the timber from the real property without the consent of all the owners, manifestly she could not authorize someone else to do so. Similarly, her contract, though valid to transfer to Rayonier her undivided interest in the timber, did not give rise to an implied license in the land; since she could not herself remove the timber, she was powerless to vest another with a right in the land necessarily incident to such removal.[12] 20 Am.Jur.2d Cotenancy and Joint Ownership § 103 (1965).

 Rayonier seeks to defeat the award of treble damages on the basis of a further Washington statute, Wash.Rev. Code Ann. § 64.12.040, which provides in relevant part that:

> "If upon trial of such action it shall appear that the trespass was casual or involuntary, or that the defendant had probable cause to believe that the land on which such trespass was committed was his own, or that of the person in whose service or by whose direction the act was done, * * * judgment shall only be given for single damages."

This statute was enacted as a companion to the timber trespass statute. It reflects a legislative intention to withhold punitive damages if the trespass was the result of an honest mistake or was committed under circumstances making unwarranted the imposition of exem-

12. The evidence makes it quite clear that Rayonier understood that it could not cut without the consent of the other one-half interest. For example, Wilton L. Vincent, the manager of Rayonier's Land Department, Northwest Timber Division, testified that he believed it would be a "useless gesture" to contract with Nina "unless the unrestricted half interest were likewise willing to have the allotments logged." Vincent also agreed that he believed that Rayonier "would not be in a position to log the allotments until an agreement was reached with the unrestricted interest." In addition, there is evidence that Rayonier had been told that "it would be up to them to enter into a contract with the owner of the unrestricted portion."

plary damages. This is clear from its application by the Washington Supreme Court. For example, in Hawley v. Sharley, 40 Wash.2d 47, 48, 240 P.2d 557 (1952), punitive damages were held to be improperly imposed upon one Locke who "inadvertently strayed or trespassed" upon plaintiff's tract which adjoined one of the parcels which he had been hired to clear. Conversely, in Smith v. Shiflett, 66 Wash.2d 462, 403 P.2d 364 (1965) that court sustained such an award on evidence that the defendant Shiflett made no survey nor any other attempt to ascertain the ownership of the lands although he had been advised that plaintiff claimed title. The case against Rayonier is even stronger than the one against Shiflett, for here Rayonier had knowledge both actual and constructive of Polson's interest in the joint venture property and Jackson's lack of authcrity with respect to sales of joint venture property. The trial court characterized Rayonier's acts as "totally unjustified" and the proof is ample to show "an element of wilfulness" necessary to support treble damages. Blake v. Grant, 65 Wash.2d 410, 412, 397 P.2d 843, 844 (1964).

▆ Rayonier next argues that the trial court erred in its award of damages in that it allowed Polson recovery in the full amount of the injury without making proper allowance for Jackson's joint venture interest.

The joint venture agreement in effect at the time of the trespass and which defined the interests of the parties between themselves contained this provision:

"It is the purpose of the parties that Polson shall be fully reimbursed for all advances out of the first proceeds of the investment held pursuant to this agreement, including, without limitation, rents, royalties and any sums received from the sale of any tract or any interest therein. After Polson shall have been fully reimbursed for all advances made under this joint venture, the parties shall share in any proceeds of the investment equally."

The trial court found, and there was evidence to support the finding, that the "practices of the parties" were consistent with their express agreement and did not modify it in any material particular; there was also evidence that Jackson had embezzled moneys from the venture well in excess of the amount reflected in the judgment.[13] The trial court thus committed no error.

The district court included in the damages the sum of $6,796.50, reflecting interest on the single damages from the date of trespass to the date of judgment. Rayonier attacks this allowance on the ground that the amount of liability was unliquidated and additionally that the statute on which the action was based precludes interest.

▆ The first ground lacks merit. In Grays Harbor County v. Bay City Lumber Co., 47 Wash.2d 879, 890–891, 289 P.2d 975, 981–982 (1955), an action to recover damages for the conversion of timber, the Washington court upheld an allowance of interest from the date of conversion despite a claim that the sum was unliquidated. Such an allowance, said the court, was proper even though the amount of liability could only be determined by expert or

---

13. For example, John H. Kirkwood, the attorney for Anna Jackson, Executrix, testified that "Jackson had embezzled thousands of dollars, hundreds of thousands." Moreover, in connection with an action brought by Polson against Anna Jackson, Kirkwood made the following verified statement:
 "In the opinion of counsel and the executrix the ultimate result of said action, [Polson v. Anna Jackson, executrix] even after giving consideration to reductions in amounts, would be a judgment far in excess of the present assets of the estate, including the value of any possible and/or potential interest in the assets of the joint venture."

opinion evidence. We are convinced that the same rule should apply here.

■■■ However, we agree with Rayonier on its second point. The Washington statute is penal in character and must be strictly construed [Bailey v. Hayden, 65 Wash. 57, 117 P. 720 (1911); Skamania Boom Co. v. Youmans, 64 Wash. 94, 116 P. 645 (1911)]; it contains no provision for interest, but rather reads: "judgment * * * shall be given for treble the amount of damages * * *." [14] The general rule is that the relief expressly provided in such statutes is exclusive and cannot be extended by implication. 22 Am.Jur. 2d, Damages §§ 267–268 (1965); Smith v. Morgan, 73 Wis. 375, 41 N.W. 532 (1889). "The statutory action is cumulative to the common law remedy, or perhaps rather an optional or alternative remedy; for a resort to either would be a bar to the other." Hughes v. Stevens, 36 Pa. 320, 324 (1860); Hall v. Pennsylvania Ry. Co., 257 Pa. 54, 69, 100 A. 1035, 1040 (1917); Bill v. Gattavara, 34 Wash.2d 645, 209 P.2d 457 (1949). The statute provides a "statutory measure of damages" and therefore by bringing the action under the statute "the plaintiffs have declared for double or treble value of the trees as their measure of damages, instead of single value with interest." McCloskey v. Powell, 138 Pa. 383, 398, 21 A. 148, 150 (1891). Although the Washington Supreme Court has never held that the statute precludes interest, it has recognized the rule, for in Blake v. Grant,

65 Wash.2d 410, 413, 397 P.2d 843, 844–845 (1964) it said:

"In the instant case, the trial court allowed interest from the date of conversion upon the punitive two-thirds portion of the award as well as the compensatory one-third part. It is recognized that the Grays Harbor [County v. Bay City Lumber Co., 47 Wash.2d 879, 289 P.2d 975 (1955)] case was not an action for treble damages; that our statutory action for treble damages is in the nature of a penalty [citations]; and that interest is generally disallowed on punitive damages. 15 Am.Jur., Damages § 299, p. 742." [15]

Rayonier's final point concerns the district court's findings of fact and conclusions of law, the common criticism being that they were so summary that "it is impossible to determine the basis of [the court's] decision on each of the affirmative defenses or whether he even ruled on them." See Fed.R.Civ.P. 52(a).

■■■ The findings do not appear in a single instrument; rather they are collated by a formal three page document entitled "Findings of Fact and Conclusions," which makes reference to various other documents and matters in the record including admitted facts, non-contested facts and lengthy transcripts of several oral opinions rendered by the court.[16]

In one of the documents the court stated:

"Each of the several defenses has been carefully considered in the light

---

14. The Washington Supreme Court, on a number of occasions, has interpreted what was meant by "damages" in the treble damage statute. The court concluded that damages should be limited strictly to the "injuries cognizable by the statute" which include injury "to growing trees, timber and shrubs or to the land itself." Guay v. Washington Natural Gas Co., 62 Wash.2d 473, 477–478, 383 P.2d 296, 299 (1963).

15. The passage in American Jurisprudence referred to flatly states: "Interest is not recoverable in statutory actions for double

or treble damages." See also 22 Am.Jur. 2d Damages §§ 179, 267 (1965); Restatement of Torts § 913, comment d at 591 (1939).

16. Courts have allowed incorporation by reference in the making of findings. E. g., Swars v. Council of City of Vallejo, 33 Cal.2d 867, 872, 206 P.2d 355, 358 (1949). We have frowned on such "shorthand" methods, but have held that they do not necessarily constitute reversible error. Nuelsen v. Sorensen, 293 F.2d 454, 459–460 (9th Cir. 1961).

of the facts I find shown by a preponderance of the evidence I considered credible, and, of course, in view of the controlling authorities, in my opinion, the evidence actually preponderates against the defenses of estoppel, ratification, and apparent authority, but at a minimum I must find, because I sincerely believe it to be correct, that there is not a preponderance of the evidence to sustain any of the affirmative defenses."

Besides this general conclusion the district court made specific findings on a number of important facts, such as the time at which Polson acquired full knowledge of all material facts, and went through a careful analysis of the credibility of the witnesses.

Although it might be helpful to the appellate court to have more comprehensive findings than in the present case [Townsend v. Benavente, 339 F.2d 421, 422 (9th Cir. 1964); Darter v. Greenville Community Hotel Corporation, 301 F.2d 70, 75–77 (4th Cir. 1962)], courts have consistently held that:

> "the federal rule relating to findings of a trial court does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient. [Citation] Nor is it necessary that the trial court make findings asserting the negative of each issue of fact raised. It is sufficient if the special affirmative facts found by the court, construed as a whole, negative each rejected contention. The ultimate test as to the adequacy of findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence."

Carr v. Yokohama Specie Bank, Limited, 200 F.2d 251, 255 (9th Cir. 1952); Manning v. Jones, 349 F.2d 992, 995–996 (8th Cir. 1965).

In the present case we believe that the findings show that the trial court both considered and ruled on each of the affirmative defenses; we are able to determine the basis of the court's decision on each; therefore, we conclude that the findings were sufficient.

The judgment is modified by deducting the sum of $6,796.50, which we have held was erroneously allowed as interest. As so modified, the judgment is affirmed. Costs to appellee.