UNITED STATES of America, Plaintiff,

v.

MALITOVSKY COOPERAGE
COMPANY, Defendant,

v.

CITY OF PITTSBURGH and Allegheny
County Sanitary Authority,
Third-Party Defendants.

Civ. A. No. 75–748.

United States District Court,
W. D. Pennsylvania.

June 28, 1979.

Craig McKay, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

George I. Minch, James G. Groninger, Pittsburgh, Pa., for defendant.

Robert B. Smith, Pittsburgh, Pa., for City of Pittsburgh.

Charles J. Duffy, Jr., Pittsburgh, Pa., for Allegheny County Sanitary Auth.

OPINION

DIAMOND, District Judge.

The United States of America brought this action against Malitovsky Cooperage Company (Malitovsky) to recover a statutory penalty and damages on the grounds that oil which emanated from the defendant's steel drum reconditioning plant had been discharged into the Allegheny River in

violation of 33 U.S.C.A. § 1321(b)(3).[1] The plaintiff sought damages in the amount of $51,884.19 plus interest, representing an administratively assessed penalty of $5,000.00[2] and the actual costs of $46,884.19 incurred by plaintiff in removing the oil from the river.[3] Jurisdiction is based on 33 U.S.C.A. § 1321(n).

Malitovsky subsequently filed third-party complaints against the City of Pittsburgh (City) and the Allegheny County Sanitary Authority (ALCOSAN), joint operators of the sanitary sewer and disposal system which serviced the defendant's plant, and the plaintiff then asserted direct claims against these parties under Rule 14(a) Fed. R.Civ.P.

The late Judge Herbert P. Sorg granted summary judgment in favor of the City and against defendant (ALCOSAN did not seek summary judgment), and this court at trial granted motions for involuntary dismissal in favor of the City and ALCOSAN against the plaintiff and against the defendant as to its remaining third-party claim against ALCOSAN.[4]

## FINDINGS OF FACT

1. Plaintiff is the United States of America.

**1.** 33 U.S.C.A. § 1321(b)(3) provides:
"The discharge of oil or hazardous substances into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone . . . in harmful quantities . . . is prohibited . . . ."

**2.** 33 U.S.C.A. § 1321(b)(6) provides:
"Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3) of this subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. . . ."

**3.** 33 U.S.C.A. § 1321(f)(2) provides:
"Except where an owner or operator of an onshore facility can prove that a discharge was caused solely by (A) an act of God, (B) an Act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party . . . such owner or operator . . . shall be liable to the United

2. Malitovsky Cooperage Company is a corporation doing business in the Western District of Pennsylvania with its principal place of business located at 3600 Smallman Street, Pittsburgh, Pennsylvania.

3. On or about October 24, 1972, oil was discharged at mile 2.9 into the Allegheny River and upon the adjoining shoreline adjacent to 36th Street in the City of Pittsburgh, Allegheny County, Pennsylvania. This oil discharge was in harmful quantities.

4. The Allegheny River is a navigable waterway of the United States.

5. Investigation conducted by members of the United States Coast Guard (Coast Guard) assigned to the Pittsburgh, Pennsylvania, district and by members of the United States Environmental Protection Agency (EPA) led them to conclude that this spill of oil was in harmful quantity and emanated from the defendant's steel drum reconditioning business located at 36th and Smallman Streets in the City of Pittsburgh.

6. Immediate steps were taken first under the direction of the Coast Guard and subsequently under the direction of the EPA for the containment, dispersal and re-

States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government . . . ."

**4.** The defendant joined the City and ALCOSAN contending that it was the responsibility of these parties to process wastes from the defendant's plant and that, therefore, they caused, or were liable for, any improper discharge of oil into the Allegheny River or onto its banks. The plaintiff then made a direct claim against these parties apparently to protect itself in the event that the defendant proved its contention. However, there was absolutely no evidence at trial which implicated either the City or ALCOSAN in the discharge. On the contrary, these parties introduced into evidence two ordinances which provided in effect: (1) that the defendant had the duty to construct and maintain the lateral sewer involved in the oil spill, as we discuss later herein and (2) that the defendant was prohibited from discharging, inter alia, oil into the City-ALCOSAN sewer system. Hence, the involuntary dismissals.

moval (hereafter clean-up) of the spill, and one Malcolm O. Castor, an employee of the EPA, was designated the on scene coordinator for the project.

7. One Sidney Mallet, President and principal owner of the defendant company, was first orally, then on November 7, 1972, by letter, advised by representatives of the Coast Guard and EPA of their conclusion that the spill emanated from the defendant's plant, and, in accordance with the provisions of the Federal Water Pollution Control Act, 33 U.S.C.A. 1151 et seq., advised him that it was his responsibility to clean up the spill and eliminate it and that if his company refused to perform the clean-up operation this would be done through agencies of the United States government, but that his company would be responsible for all costs thus incurred. Mr. Mallet denied that the spill came from defendant's plant and refused to assume any responsibility for it.

8. On November 5, 1972, the EPA entered into a contract with Clean Water, Inc., a company experienced in cleaning up oil spills, to perform the clean-up operation, and from shortly thereafter until January 6, 1973, Clean Water, Inc. performed the work under the contract.

9. An abandoned sewer, which was the conduit through which the oil ultimately found its way onto the river bank and into the Allegheny River, was excavated to in several locations "downstream" between defendant's plant and the river. It was then flushed and cleaned with fresh water which was pumped from the sewer into tank trucks and disposed of at a landfill. Approximately 75,000 gallons of this water-sludge substance was thus removed. The sewer was then sealed at the several excavations with concrete plugs.

10. The efforts of the Coast Guard, the EPA and their contractor, Clean Water, Inc., were successful and the spill was cleaned from the river and river bank and eliminated.

11. The total cost of the clean-up operation was $46,884.19; the bulk of which, $43,242.24, was paid to Clean Water, Inc.,

with $2,678.08 going to the EPA for expenses and costs of the on scene coordinator, and the balance for other expenses and supplies. All of these costs were paid on or before June 1, 1973, and all of the costs were fair and reasonable and necessitated by defendant's refusal to clean-up, contain and eliminate the oil spill aforesaid.

12. On September 12, 1973, the Coast Guard made demand on the defendant for the payment of this bill for clean-up costs in the amount of $46,884.19. To date this has not been paid.

13. Following the spill and prior to the institution of the instant suit the defendant was afforded an administrative hearing before the Coast Guard under the provisions of 33 U.S.C. § 1321(b)(6) as a result of which on August 31, 1973, the defendant was advised by the Coast Guard that defendant had been assessed an administrative civil penalty of $5,000.00. To date this has not been paid.

## DISCUSSION

This case was tried to the court without a jury. The principal and, in effect, sole factual issue concerned the source of the oil discharge which was discovered on October 24, 1972, at mile 2.9 on the Allegheny River adjacent to 36th Street in Pittsburgh, Allegheny County, Pennsylvania. The defendant did not dispute the fact that the spill occurred, that it consisted basically of oil or that this was in harmful quantity. And while the defendant did not agree to the reasonableness of the costs incurred in the clean-up operation, neither did it offer any proof to refute or contest the reasonableness or necessity of those costs.

The Government established that the oil on the river bank and in the river emanated from the defendant's plant in several ways by proof which was quite persuasive. First, dye tests were conducted by depositing a powdered dye at various places in the drainage areas in defendant's plant, which dye ultimately appeared in an abandoned sewer. This sewer, which was referred to as the 1874 sewer, ran underneath 36th Street ad-

jacent to defendant's plant and had its terminus under the bank of the Allegheny River where the oily sludge here involved oozed and bubbled onto the bank and into the river. The sewer was excavated at several places including its terminus at the river bank, and again dye was found in the sewer and at the point on the river bank where the oil sludge was seen.

An engineering firm was retained by the defendant to inspect the industrial waste discharges from its plant. The results of this inspection were consistent with the dye tests run by the Government. In a March 15, 1973, report to the defendant, the engineering firm stated in part:

"Industrial wastes enter the plant sewer at an oil separator overflow and a rinse water separator overflow. Dye tests performed [by this engineering firm] on November 20, 1972 indicated that both overflows discharge to one 12-inch lateral sewer in Spruce Way. The lateral sewer is connected to a 36-inch City of Pittsburgh sewer (built 1905) on Thirty-sixth Street . . . .

"Industrial wastes in the lateral sewer discharged to the 1905 sewer; however, *the dye tests also indicated that a small portion of the industrial wastes entered another 36-inch city sewer (built 1874) on Thirty-sixth Street. The lateral sewer crossed over the 1874 sewer before connecting to the 1905 sewer.*" (emphasis and matter in brackets added).

Next, samples of oil were taken from the defendant's plant, the abandoned sewer, the river bank and river. These were subjected by an EPA laboratory chemist to chemical and spectrographic analyses from which he concluded that the oil on the river bank and in the river were identical to that at the defendant's plant.

Several witnesses testified concerning the nature of the business conducted at the defendant's plant and the condition of the plant itself. Their testimony was consistent that the plant was "covered" with oil, that oil and emulsified oil from the plant entered its drainage system and from there into the abandoned 1874 sewer. There was testimony that the defendant company processed approximately 700 barrels a day, at least sixty percent of which had contained lubricating oil. Residual oil in the used drums entering the plant was drained and the drums were washed, acid cleaned and/or sandblasted, painted, and returned to the customer. In this process, quantities of oil were recovered and shipped out in tank trucks, but a great deal of it remained on the plant floor beneath a grated steel decking or escaped from an oil separator or a rinse water separator, and this ultimately found its way into the drainage system which discharged to the 12-inch lateral sewer owned and used by defendant company.

In its March 15, 1973, report to the defendant from which we previously quoted, the engineers retained by the defendant stated, and we find as a fact, as follows:

"Subsequent excavations along the route of the lateral sewer from the 1905 sewer to the curb, revealed that five sections (approximately 10 feet) of the lateral sewer were broken, and that industrial wastes escaped from the lateral sewer through broken sewer joints and other openings. The lateral sewer rested directly on top of the 1874 sewer. Industrial wastes may have percolated through the broken sewer joints and other openings into the 1874 sewer. The damaged 12-inch pipe sections were replaced, and the sewer encased in concrete to assure that the condition would not reoccur."

Mr. Mallet testified that the defendant owned the 12-inch lateral sewer and paid for its repair.

Next, virtually every other possible source (including the only other user of the 12-inch lateral sewer) of the oil spillage was investigated and eliminated as a source by the plaintiff, thus leaving the defendant company as the only possible source by the process of elimination. And as final confirmation, when the abandoned sewer was plugged between the point of spillage on the river bank and the defendant company, all further discharge terminated.

In the face of this convincing evidence, the defendant offered weak rebuttal. As

previously noted, its dye tests were consistent with the dye tests conducted by the plaintiff. And while the defendant took some oil samples, the testimony was that these were never tested. In any event, the defendant offered no evidence regarding any samples which it took or any tests which it ran, which were inconsistent with the findings of the Government.

■ While the defendant complained that the Government did not eliminate all other possible sources of the spill, defendant was unable to produce any proof that there was any other source. And the testimony of defendant's chemist who disputed the validity of the conclusions of the Government chemist was unpersuasive. As one of the Government witnesses testified, the field evidence, i. e., the dye tests, the visual observations of the defendant's plant, and the on scene examination of the sewers involved, alone were sufficient evidence that the spill emanated from the defendant's operation, and scientific corroboration was superfluous. The court, therefore, is quite satisfied by the evidence that the oil spill emanated from the defendant's plant.

On the issue of damages, as we previously noted, the defendant offered no evidence challenging the Government's case in support of the actual costs which it incurred in the clean-up operation. The plaintiff established the nature and amount of these costs, that they were fair and reasonable, and that they were incurred in cleaning up the oil spill caused by the defendant.

■ In addition to the costs incurred and the penalty assessed, we have concluded that the plaintiff is entitled to the addition of prejudgment interest on the award of the *costs incurred* only. This is at the rate of six percent per annum, simple interest, from September 12, 1973, (see finding No. 12) until the date of our judgment, June 28, 1979, a period of five years and two hundred eighty-nine days at the rate of $7.707 per day for a total amount of $16,292.60.

■ The interest awarded is compensatory, not punitive, and is within the discretion of the Court. *Rayonier, Incorporated v.*

*Polson*, 400 F.2d 909, 921 (9th Cir. 1968); *Cutten v. Allied Van Lines, Inc.*, 349 F.Supp. 907 (C.D.Cal.1972); *United States v. Levine*, 187 F.Supp. 154, 156 (E.D.N.Y. 1960). In the exercise of our discretion in awarding interest, we have taken into consideration a number of factors. *Speed v. Transamerica Corporation*, 135 F.Supp. 176, 199 fn. 62, (D.Del.1955) modified & aff'd 235 F.2d 369 (3rd Cir. 1956). First, we believe that it was clear that the oil spill emanated from the defendant's plant and that the defendant knew or should have known this as early as the Fall of 1972, but certainly by March of 1973 when it received the written report of its privately retained engineering firm to which we previously referred. This was six months before the defendant received the clean-up bill from the plaintiff. Even by the time of trial the defendant had no evidence to contest the validity or reasonableness of the amount expended by the Government, nor did the defendant offer any evidence that the spill emanated from a source other than its plant or seriously to contest the evidence offered by the Government to prove that the defendant was the responsible party.

We applied the legal rate of interest prevailing in Pennsylvania of six percent per annum. See *Royal Indemnity Co. v. United States*, 313 U.S. 289, 297, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); 41 Pa.C.S.A. 202. However, it is common knowledge that during much of the period from September of 1973 until the present the prime interest rate has been considerably above six percent, and certainly the Government has been required during this time to pay higher than six percent interest to borrow money. In our opinion, the "costs" thus incurred by the Government as a result of the defendant's detention of the money *advanced by the government for the clean-up* constitute a part of the costs incurred and thus the responsibility of the defendant. We believe, therefore, that the assessment of interest is necessary to fairly compensate the Government.

■ We have not added interest on the $5,000.00 penalty because the statutory ba-

sis therefore is, of course, penal in character and must be strictly construed, and since there is no provision in the statute for interest, we cannot extend it by implying interest. *Rayonier*, supra, p. 922.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter and parties of this action.

2. The defendant is liable to the United States in the sum of $46,884.19 plus simple interest in the amount of $16,292.60 calculated at the rate of six percent per annum from September 12, 1973, to the date of this judgment, June 28, 1979, plus the payment of an administrative penalty of $5,000.00, for a total of $68,176.79.