[No. 29259. Department One. July 19, 1944.]

J. J. DORSEY et al., Respondents, v. GUS STRAND, Appellant.[1]

[1]Reported in 150 P. (2d) 702.

*Hogan & Adams,* for appellant.

*J. E. Stewart,* for respondents.

GRADY, J.—This action was commenced by plaintiff Seaplane Fisheries Service, Inc., against defendant, Gus Strand, to recover a sum of money for services rendered during the season of 1941 in locating schools of pilchard by the use of an aeroplane and communicating the information to fishing boats, for which services it is claimed the defendant promised to pay. During the trial the court made an order joining J. J. Dorsey as a party plaintiff. A judgment was rendered against the defendant, from which this appeal has been taken. In this opinion, we shall refer to the corporation as though it were the sole respondent.

The events leading up to the litigation are as follows: The appellant and others were engaged in the business of purchasing pilchard for canning. Their processing plants were located in what is known as the Columbia river and the Grays Harbor districts. During the fishing season of each year, the pilchard run in schools and may be found

off the coasts of British Columbia, Washington, and Oregon. Certain persons owned fishing boats. They employed fishermen and sold their catches to the packers. Some sold indiscriminately, while others contracted with a certain packer for all fish caught. Canadian boat owners and fishermen also operated in the same coastal waters.

For some time it had been the custom of the Columbia river and the Grays Harbor packers to meet with representatives of the fishermen and boat owners shortly before the opening of the fishing season to discuss and agree upon the compensation to be paid the fishermen for catching and the boat owners for delivering the fish during the coming season. In the early part of May, 1941, such a meeting was had in Seattle. After the primary business of discussing compensation and prices was over, a discussion was had about the advantage of using an aeroplane to fly over the area to locate the schools of pilchard and report their location by radio to the fishing boats and thereby secure a greater tonnage than could be had by the regular method.

There is a conflict in the testimony as to what was the net result of the discussion. But we conclude, after a review of it, that a committee of three was selected, consisting of J. J. Dorsey, president of the Bay City Fishing & Packing Company, representing the packers, Bernhard Sandvick, secretary of the Pacific Coast Purse Seiners' Association, representing the boat owners, and Paul Dale, representing the fishermen's union, and they were authorized to find an aeroplane, with pilot and observer, that could be chartered to undertake the services, and report back at another meeting of the three groups. It was contemplated that at this later meeting the final details of the plan would be agreed upon as among themselves and furnish the basis of a contract with the owner of the plane. It was tentatively considered that for the services rendered the fishermen and boat owners should pay the sum of twenty cents a ton for fish caught during the season.

During the discussion, Mr. Dorsey stated that he knew of a plane and a pilot that might be secured. It seems that he had an arrangement, which he termed an option, with

a plane pilot residing in California to the effect that, if the plane was secured, Mr. Dorsey might purchase it from him. He did not disclose these facts at the meeting. The appellant understood from the discussion, and we think he was justified in so understanding, that, if a plane was chartered and the operator and observer were furnished by its owner, they would be impartial in notifying the boats of the location of the schools of pilchard and no one boat or packer would gain any advantage over the others; also, that a contract would be made with the owner of the plane. It is at this point that the whole trouble involved here starts.

Instead of the committee acting as a whole and proceeding to carry out its instructions, Mr. Dorsey took the entire matter over and, without consulting the other members of the committee, exercised what he termed his option and purchased the plane. He put it in operation late in June, using the airport at Westport as a base. Title to the plane was transferred to the respondent after it was incorporated on June 24, 1941. Mr. Dorsey was one of the incorporators and became the owner of all of its capital stock except two qualifying shares. A few weeks after the meeting, Mr. Dorsey prepared and presented to appellant and others the following instrument:

"MEMORANDUM OF AGREEMENT      MAY 22, 1941

"Owing to past difficulties in locating schools of pilchards in the Columbia River, Oregon and Grays Harbor, Washington Fishing Districts, it has been deemed desirable to secure an Amphibian Aeroplane with an experienced efficient Aviator for the purpose of scouting and locating schools of Pilchards. An option to charter a Loening Commuter Amphibian (Photo of which is attached) together with an experienced Pilot, has been secured for this purpose. The owners want a cash advance of $1,500.00, and agree to operate the Plane and diligently scout for the schools of Pilchards for 20¢ per ton on all the Pilchards caught and delivered to the packers in both districts. The cash advanced for guarantee to be returned to the parties who make the advance from the first $1,500.00 earned. This agreement when signed by all parties will be accepted by owner as charter for the Plane.

"At official meetings in Seattle during May 1941, both the Fishermen's organization and the Boat Owner's Assn. who fish these waters for Pilchards agreed to pay 10¢ per ton on all Pilchards caught and delivered to Packers, with the proposal that the Packers are to pay 10¢ per ton on all fish received by them for the service rendered by the aeroplane. It was also proposed that all boats fishing for Pilchards in these Districts during the 1941 season be required to pay 10¢ per ton on fish caught and delivered for the services of the aeroplane. It is now agreed by all the parties that the Packers are hereby instructed to deduct 10¢ per ton from the fish payments on all Pilchards received by them and to pay this amount together with a like amount agreed to by them to the Seaplane Service account at the National Bank of Commerce at Aberdeen, Wash.

"We agreed to the above: . . ."

The agreement was signed by the packers, including the appellant, the boat owners' association, and the union. All parties except the union also signed under the caption "Guarantors" and placed after their respective names amounts aggregating the sum of thirteen hundred dollars.

On July 29, 1941, the respondent corporation sent a copy of the above-quoted instrument to appellant, asserting that it was the contract between it and the packers, boat owners, and fishermen, and requested payment based upon the tonnage of fish he had received to date. On July 31st, appellant wrote respondent as follows:

"We received your letter of July 29.

"To our knowledge, we have no dealings whatsoever with your corporation and therefore we do not owe you anything.

"We assume that your letter has reference to certain negotiations which were had last May among a number of firms contemplating processing of Pilchards. It is our position that these negotiations remained nothing but negotiations, and were never consummated into a binding legal contract, so that we do not consider that we now have any legal contract with any person, firm or corporation whatsoever in relation to the use of an airplane. But, even if we have (which, of course, we do not admit), we now wish to give notice and we do hereby give notice to you, that we are withdrawing and do hereby withdraw from the

contemplated arrangement for the use of an airplane. So if you are interested in any way, please count us 'out.' "

No payments having been made by appellant, this action followed. Other facts will be referred to in our discussion of the questions presented.

The first question to be determined is, what was the purpose and effect of the above-quoted written instrument which is designated in the record as exhibit A? The versions of the respective parties with reference to exhibit A can best be stated by quoting from their briefs. The appellant states:

"(a) Either the 'memo' (Exhibit 'A') was but a step in the preliminary negotiations for the renting of an airplane with a competent, impartial observer which had not yet ripened into an actual contract for the renting of a plane, or,

"(b) That it was a subscription list, a commitment or an offer to contribute 20¢ a ton in all by the three groups toward the rental of a plane and if an offer (which we think it was) that could only be accepted by an individual or a concern meeting the requirements that that individual or concern would be selected by the committee of three appointed at the Gowman Hotel meeting and approved by a meeting subsequently held by the interested parties in acting upon the report of the committee and it was not an offer that Dorsey or any straw corporation organized by him or that any other packer could accept and bind the signers."

The respondent says:

"It is our claim that when Exhibit 'A' was signed by Mr. Strand at the request of Mr. Dorsey, it very definitely became an offer for an act, and that when Mr. Dorsey performed the act contemplated, there arose a binding contract. We have here a perfect example of a unilateral contract, and it is upon this contract that the plaintiff bases his right of recovery."

■ As exhibit A was prepared by Mr. Dorsey, it must be construed, where construction is necessary, against respondent and in favor of appellant. *State Bank of Wilbur v. Phillips*, 11 Wn. (2d) 483, 119 P. (2d) 664, and cases cited therein. This should be especially true when the one drawing the instrument stands in a relationship towards

the other party whereby such party has a right to rely upon the other to carry out a particular transaction in the manner contemplated at its inception.

Because the instrument contains recitals and statements of existing facts and events which transpired at the Seattle meeting, it is difficult to give it any particular designation. But, taking it together with the matters discussed at the meeting, we think it proper to conclude that it was intended by all parties to be something that the committee might present to the plane owner referred to as indicating their desires, and what the plane owner could feel he would have in the way of a preliminary guaranty and the compensation to be paid for the services rendered in the event a contract was ultimately entered into. By signing the instrument, the parties apparently intended to waive the necessity of the committee's reporting at a subsequent meeting of the boat owners, packers, and representatives of the union, and to leave entirely to the committee the duty of carrying out the plan tentatively agreed upon at the first meeting. The plan contemplated that the whole committee should act, and in so doing its members became joint agents for these parties.

■ It is a general rule that, when authority is given to two or more persons to act as agents in a matter of a private nature, it is presumed to be joint and all must act jointly in order to bind the principal. *Unterberg v. Elder*, 211 N. Y. 499, 105 N. E. 834, Ann. Cas. 1915C, 616, and note; *Robbins v. Horgan*, 192 Mass. 443, 78 N. E. 503; 2 C. J. S., Agents, p. 1345, § 122; 2 Am. Jur., Agency, p. 201, § 249; Restatement of the Law of Agency, p. 100, § 41; 1 Mechem on Agency (2d ed.), p. 142, § 198. The limitations on and the exceptions to this rule are discussed in these authorities and the cases they cite. The rule is based upon the idea that the nature of the act to be done or the business to be transacted is such that the principal desires to have the benefit of the combined experience, judgment, discretion, or ability of all of the agents. We find nothing in the manner of selecting the committee of three or the duties to be performed by

them indicating any intent other than that they should act jointly.

■ Now it seems quite clear that, when Mr. Dorsey took matters into his own hands and did not act jointly with the other members of the committee, he violated this rule and his purchase of a plane was without authority, and no contractual relationship was created between the appellant and either Mr. Dorsey or the respondent.

■ If we should treat exhibit A and what went before it as the basis of a unilateral contract as claimed by respondent we encounter this difficulty: The proposal or offer, if it may be designated as such, was intended to be made to the owner of the plane referred to in exhibit A, from whom the claimed option had been secured, and he was the only one who could accept it. It was not made to Mr. Dorsey or to any corporation he had in contemplation, and could not be accepted by him or it, because of the rules of law that one has the right to know with whom one is contracting and that, when an offer is made, it can be accepted only by the offeree, and, if the acceptance is to be manifested by the doing of an act, such act must be done by the offeree or there is no contract creating any obligation on the part of the offerer.

The rule that a revocable offer can be accepted only by the person to whom it is made is elementary, and reference thereto may be found in Restatement of the Law of Contracts, p. 60, § 54; 1 Williston on Contracts (Rev. ed.), p. 231, § 80; 12 Am. Jur., Contracts, 532, § 38; 17 C. J. S., Contracts, 372, § 40.

A leading case on the right of one to know with whom one is contracting is *Boston Ice Co. v. Potter*, 123 Mass. 28, 25 Am. Rep. 9, and it is there stated, p. 30:

"A party has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent. It may be of importance to him who performs the contract, as when he contracts with another to paint a picture, or write a book, or furnish articles of a particular kind, or when he relies upon the character or qualities of an individual, or has, as in this case, reasons why he does not wish to deal with a par-

ticular party. In all these cases, as he may contract with whom he pleases, the sufficiency of his reasons for so doing cannot be inquired into. If the defendant, before receiving the ice, or during its delivery, had received notice of the change, and that the Citizens' Ice Company could no longer perform its contract with him, it would then have been his undoubted right to have rescinded the contract and to decline to have it executed by the plaintiff. But this he was unable to do, because the plaintiff failed to inform him of that which he had a right to know."

In the case at bar, it was of importance to appellant to know whether he was about to contract with a competitor, or some corporation formed by Mr. Dorsey for plane service, or with a disinterested stranger, and whether the observer of the plane in locating the schools of pilchard and signaling the fishing boats would be disinterested, or in the employ of a competitor, or the other party to the transaction.

The respondent has cited *Hamilton v. Best Gas Traction Co.*, 123 Wash. 488, 212 Pac. 1077; *Scott v. Duthie & Co.*, 125 Wash. 470, 216 Pac. 853, 28 A. L. R. 328; and *Lasswell v. Anderson*, 127 Wash. 591, 221 Pac. 300. In those cases, the one performing the act which created liability on the part of the offerer was the person or class of persons to whom the offer was made, and they are therefore not applicable.

No matter what view may be taken of exhibit A when Mr. Dorsey presented it for signature to the appellant, it was his duty as a member of the committee, or even acting individually or for the committee, to have disclosed and made known to appellant that he was the one who had the option referred to, or was the owner of the plane, or was about to acquire it, as, in view of what had transpired at the Seattle meeting, appellant had the right to assume that the option had been secured by the committee. The reason for this is that the Bay City Fishing & Packing Company, of which Mr. Dorsey was president and in which he was a large stockholder, was a competitor of appellant in the purchasing and packing of pilchard, and he knew, or should have known, that appellant might not as readily have assented to being served by a plane owned by, and

which was to be operated by, the employees of that corporation, or one which he might form, as would have been the case if the plane were owned by a stranger and noncompetitor and its operators were employed by such owner.

It is a well-settled rule of law that when one purports to act for another and bring him into contractual relations with a third party, he not only owes him the duty to make a full disclosure of all the facts, but he also cannot secretly become the beneficiary of a contract he may have caused to be entered into. These principles are recognized in *Anderson v. Lawler,* 46 Wash. 543, 90 Pac. 913; *Perkins v. Perkins,* 151 Wash. 252, 275 Pac. 541; *McRae v. Farmers State Bank of Reardan,* 178 Wash. 642, 35 P. (2d) 58. A very clear statement of the general rule is found in 2 Am. Jur., Agency, p. 204, § 253:

"The doctrine is familiar and well recognized that an agent cannot, either directly or indirectly, have an interest in the subject-matter of the agency without the consent of his principal, freely given, after full knowledge of every matter known to the agent which might affect the principal. The object of the rule is to secure fidelity on the part of the agent to the principal and to insure the transaction of the business of the principal for his best advantage. This doctrine is based on the idea of closing the door to temptation to fraud and keeping the agent's eye single to the rights and welfare of his principal, rather than on the idea that the transaction is necessarily an injury to, or a fraud upon, the principal. Hence, a principal need not prove any injury to avoid a transaction in which the agent has acted as an adverse party without his knowledge and consent. The principle is one of prevention, not remedial justice, which operates however fair the transaction may have been—however free from every taint of moral wrong."

The reasons why these principles are applicable here are that even though it might be said that, in the operation of the plane in searching for schools of pilchard and notifying the boats, the pilot and observer acted impartially, nevertheless there was created the opportunity to do and act otherwise, and this is what the law condemns.

As before pointed out, the plane actually engaged was at first owned by Mr. Dorsey and later by the respondent,

a corporation in which he owned and held all of its capital stock except two shares. It was operated, except the first week, by a pilot who had been engaged by Mr. Wilde, a substantial stockholder in the Bay City company. His salary was paid by respondent. Mr. Wilde was the observer in the plane until July 26th. The respondent then employed another observer who acted as such for the rest of the season.

When the observer in the plane located a school of pilchard he would radio its location to the boats. The boats, whether they were those having contracts with a particular packer, or were independent, or were Canadian, if they carried radio sets and had the same short wave frequency as the others, would receive the broadcast and thus be enabled to go to the location of the school of fish. At times the radio on the plane would not work, and in such case contact would be made with the nearest boat or boats and a note dropped giving the information and the plane would then circle the school until such boat or boats could locate it.

While it is stoutly claimed there was no discrimination made by the operators of the plane among the various boats or favoritism extended to the boats fishing for the Bay City company, there were circumstances and some evidence to the contrary, to the effect that frequently instead of making a general broadcast the observer would call a particular boat by its call letters, usually one fishing for the Bay City company, and thereby it would have an advantage in locating the school of fish. Mr. Wilde when not on the plane operated a pilot boat and piloted boats loaded with fish to the Bay City plant, and on the boat he had a radio set which enabled him to keep in touch with the boats, and he admitted that he tried to get fish for that plant. We deem it unnecessary to make a direct finding of fact as to whether there was any discrimination made among the boats or favoritism shown by the observers on the plane, but there was ample opportunity for both to occur and thereby place the Bay City plant in an advantageous position over that occupied by appellant, and this makes the foregoing rules applicable.

It is contended, however, that the acts of Mr. Dorsey were ratified by the appellant and he became bound to pay the claim upon which this action was brought. The meeting in Seattle was held early in 1941. Exhibit A is dated May 22nd. The plane commenced to operate in the later part of June. The respondent corporation was formed June 24th. Up to this time no information had been conveyed to appellant as to what had transpired with reference to exhibit A. An article appeared under date of July 3rd in an Aberdeen newspaper about a plane scouting for pilchard out of Westport and a description of its method of operation, which was read by appellant. About then he became aware of the fact that a corporation had been formed in which Mr. Dorsey was interested and that there was a scouting plane in operation. The boats fishing for him responded to the communications given by the plane to boats generally as to location of the schools of fish. But it is quite clear that he then believed that the plane had been secured and was being operated in the manner contemplated at the Seattle meeting and by exhibit A. His first suspicion, if it can be called such, was about July 14th, when he wrote a letter to the Bay City company, complaining among other things that

"The scouting plane in which we are all supposed to have an interest is being used for your own personal benefit. If this continues, we will have to withdraw from the plan."

Some time after this letter was received (Mr. Dorsey stated probably the 25th or 27th of July), appellant attended a meeting at the Bay City plant. The purpose of the meeting and what was discussed there is somewhat in dispute, but it does seem that there was a feeling on the part of appellant that, as he expressed it, "Dorsey was trying to take hold of our boats and we wanted to know why he would do that." At this meeting, there was presented a telegram from one of the packers at Astoria reading as follows:

"CONFIRMING OUR TELEPHONE CONVERSATION TODAY WE ARE HEREBY NOTIFYING YOU AT IN ACCORDANCE WITH OUR AGREEMENT OVER THE TELEPHONE WE WILL DISPENSE WITH YOUR SERVICE INSOFAR AS THE SEAPLANE IS CONCERNED FOR SPOTTING

PILCHARDS. YOUR REFUSAL TO SEND THE PLANE SOUTH OF THE COLUMBIA RIVER AND YOUR NOTIFICATION TO ME PERSONALLY THAT IF WE ARE NOT SATISFIED WITH YOUR SEAPLANE SERVICE WE COULD HIRE OUR OWN PLANE IS HEREBY ACCEPTED. WE ARE MAKING OUR OWN ARRANGEMENT FOR THIS DATE FORWARD AND IN ACCORDANCE WITH YOUR PROPOSAL YOU MAY CONSIDER OUR AGREEMENT TO PAY TEN CENTS PER TON FOR OUR PLANT AND TEN CENTS PER TON FOR FISHERMENS ACCOUNT FOR FISH DELIVERED TO OUR PLANT TERMINATED AS OF THIS DATE. WE WILL BE GLAD TO SEND YOU A CHECK COVERING RECEIPTS INCLUDING TODAY BUT WILL NOT PAY YOU ANYTHING FOR SERVICE HEREAFTER"

During the discussion that followed, it appeared that this packer's complaint was that the plane was flying around Grays Harbor and not coming as far south as the Columbia river. It was pointed out by one of the parties present that at that time the fish were running off the Grays Harbor coast and not the Oregon coast so that was why the plane spent so much time at the former place. Appellant then made a suggestion to the effect that some way should be worked out so the plane could be operated by the Grays Harbor packers. We believe from what took place at this meeting, supplemented with what incomplete information appellant had, that he in a sort of vague way felt that all was not well and that Mr. Dorsey owned or had some interest in the plane. At any rate, when he received a letter from the respondent enclosing a copy of exhibit A and a request for a check for the tonnage of fish received to date, he at once wrote him the letter of July 29th set out above. It is our opinion that up to this time the appellant did not have such knowledge of the facts relative to the whole transaction that his conduct in receiving pilchard from his fishing boats and in suggesting that the plane operate for the Grays Harbor packers alone can be said to amount to a ratification of the acts of Mr. Dorsey in buying the plane and putting it in operation, instead of carrying out the plan as appellant understood it would be with reference to chartering a plane.

The fact that boat owners with whom the appellant had contracts located fish by information imparted by the plane, would not cast upon the appellant any liability to pay

anything to the owner of the plane unless he contracted so to do. No such contract was ever made between the respondent and appellant. In order to bind the appellant to pay twenty cents a ton for the fish delivered to him under the situation as disclosed by the record, it would have to appear that during a substantial part of the time prior to July 29th he had known the plane belonged either to Mr. Dorsey or the respondent and its use had not been acquired as contemplated at the Seattle meeting and by exhibit A and accepted the benefits of the scouting plane with such knowledge.

The rule is that an unauthorized act of an agent, or one purporting to act as such, may be ratified so as to bind the principal as fully as though such agent were originally authorized to do the act or contract in behalf of the principal as he did. But all this presupposes knowledge of the facts on the part of the principal whether the claimed ratification is express or implied from conduct. Believing as we do that the plan for securing the services of a plane to scout for pilchard was not carried out as contemplated at the Seattle meeting and by exhibit A and that the acts and conduct of Mr. Dorsey with reference thereto were not ratified by appellant, we must conclude that the respondent cannot recover in this action.

The judgment is reversed, with direction to the lower court to enter an order dismissing the action.

SIMPSON. C. J., BEALS, STEINERT, and JEFFERS, JJ., concur.