The **MONOTYPE CORPORATION PLC, a corporation organized and existing under the laws of England, Plaintiff–Appellee, Cross–Appellant,**

v.

**INTERNATIONAL TYPEFACE CORPORATION, organized and existing under the laws of New York, Defendant–Appellant, Cross–Appellee.**

**INTERNATIONAL TYPEFACE CORPORATION, Third–Party Plaintiff,**

v.

**MONOTYPE, INC., an Illinois corporation; and Monotype Typography, Inc., an Illinois corporation, Third–Party Defendants.**

Nos. 93–35478, 93–35511.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 1994.

Decided Dec. 21, 1994.

M. Margaret McKeown, Seattle, WA, Paul Stack, Stack, Filpi & Kakacek, Chicago, IL, for plaintiff-appellee-cross-appellant and third-party-defendants-appellees.

Richard Stephen White, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, WA, Nathan J. Waldman, Sperry, Weinberg and Waldman, New York City, for defendant-appellant-cross-appellee and third-party-plaintiff-appellant.

Before: WOOD, Jr.,* HUG, and TANG, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge:

Ordinarily when we read a printed page we are seeking the meaning conveyed, but in this case we are required to look beyond the page into the very competitive international typeface business. To some extent we must consider the various typefaces, their history and development, the business relationships of competitors, and other aspects of this unique business. Even so, only ordinary issues of contract, evidence, instructions, the conduct of the trial, and related issues are involved. The problems initially arise because typefaces are not afforded copyright protection which has permitted popular typefaces originally developed by one to be easily and closely copied by a competitor without compensation.

## FACTUAL BACKGROUND

The Monotype Corporation PLC ("Monotype"), plaintiff, is an English corporation founded in 1897 for the purpose of manufacturing and selling the Monotype typecaster, an ancestor of modern practice. The rights to manufacture and sell these typecaster machines were purchased from the inventor. As Monotype grew, so did the demand for its typefaces. David Saunders, a long-time employee and keeper of the Monotype historical records, identified at trial Monotype books from as early as 1910, which showed the variety of typefaces offered by Monotype. In the 1930's Monotype retained some of the most recognized experts to design its typefaces, one of whom in 1931 designed one of the most popular typefaces, Times New Roman.

International Typeface Corporation ("ITC") was organized in 1969 in the United States to promote typeface design in this country through voluntary agreements among competitors not to copy or simulate the work of ITC designers. Before ITC was established copyright protection was not available, and segments of the industry would copy popular typefaces developed by another to market it without making royalty payments to the designer. ITC was therefore created to offer subscribers typefaces from the best designers, and to create a demand for these typefaces by investing in their promotion under trademark names. It is through ITC's "Subscriber Agreements" that the license to distribute ITC's typefaces could be obtained by another in the market. Under the agreement, each company paid

* Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by

designation.

ITC a royalty fee for each ITC typeface it distributed.

Monotype and ITC entered into ITC's standardized "Subscriber Agreement" in 1979. Both companies recognized a need for expansion that each company thought the other could help fill. The purpose of the agreement was to ensure that Monotype would pay royalties to ITC for the ITC designs which Monotype distributed to its own customers. In return for the royalties, ITC would promote the licensed typefaces and subscribers as people who voluntarily followed an ethical code. The agreements are terminable on ninety days notice at the option of the subscriber. Subsequent to the execution of the agreement, the companies each engaged in their own businesses. Monotype paid ITC royalties for ITC Alphabets which Monotype distributed to its customers.

The Subscriber Agreement (which by its terms represents the entire agreement of the parties) contained the following provisions which are at issue:

1. Except as otherwise agreed to in writing, any Alphabets licensed by ITC may only be faithfully reproduced by the Subscriber without modification ... and only from artwork or drawings supplied by ITC and the Subscriber shall not, directly or indirectly, produce, sell, or offer for sale, lease or otherwise dispose of any ITC Alphabets, regardless of whether they have or have not been licensed hereunder, to anyone in any manner other than pursuant to all of the terms and conditions of this Agreement, nor shall the Subscriber create or offer to its customers any weight or version of a licensed Alphabet which is not available from ITC.

Alphabets were defined thusly:

"Alphabet" shall mean a set of all the letters of the alphabet.... Each weight or version of a single typeface design such as Roman or Italic in an expanded or condensed or outline form, for example, without limitation, shall be considered as a separate Alphabet.

Following formation of this relationship between Monotype and ITC, another company, Adobe Systems, developed a computer software program called PostScript. Adobe worked in conjunction with Apple Computers to develop a PostScript device for the Laser-Writer, a printer marketed by Apple. Initially included with the LaserWriter were thirteen typefaces in PostScript format. Adobe and Apple later added twenty-two additional typefaces to the LaserWriter set. This collection of thirty-three typefaces and two symbols is known as the "Laserwriter Plus 35," which quickly became the industry standard.

In the early 1990's, Microsoft decided to assemble a collection of typefaces for its Windows software program. Microsoft wanted a collection of typefaces in computer format to compete with those offered by Adobe in PostScript format. The typefaces had to be of the same "width metrics"[1] and of similar style so the documents created with one set of core fonts could print on a system using another set of core fonts. Adobe set the width metrics for nine of the ITC typefaces used in the LaserWriter.[2]

Monotype submitted a list of typefaces for Microsoft's consideration. Included in Monotype's offering were competitive substitutes for the original thirteen typefaces. Later, Monotype offered Microsoft a competitive list of all thirty-five typefaces except the nine ITC typefaces and ITC Zapf Dingbats.[3] Monotype also offered Microsoft the right to license the ITC typefaces at the royalties set by ITC. Microsoft believed, based on the advice of its type director, that the royalties

1. The term "width metric" means the horizontal spacing consisting of the width of the letter along with the white space on either side.

2. ITC initially claimed that they set the width metrics for the nine ITC typefaces used in the LaserWriter. However, at trial, ITC conceded that the conversion was done by Adobe. Neither Apple nor Adobe has claimed any proprietary interest in the width metric of these typefaces.

3. The typefaces at issue are nine of the ITC 10 in the Apple LaserWriter. The nine include: four weights of ITC Avant Garde; four weights of ITC Bookman; and ITC Zapf Chancery. The tenth ITC typeface is Zapf Dingbats, which was excluded from the jury's consideration. ITC Zapf Dingbats is a set of copyrighted symbols.

would be excessive in light of the anticipated volume of constraints since similar typefaces could be offered under other names without the payment of royalties.

Microsoft then expressed interest in licensing from Monotype the typefaces competitive with the ITC typefaces and ITC Zapf Dingbats. Monotype claims that it then went into its archives and located several old typefaces that, with some modifications, could meet the Adobe width metrics. The modification process began around March 1991. Subsequently in September 1991, Microsoft accepted Monotype's proposal and the Monotype typefaces were released as part of the "Microsoft Font Pack." ITC claims, however, that Monotype did not go back into its archives and independently create these typefaces. ITC asserts that Monotype "cloned" the ten ITC typefaces to make Monotype's "competitive typefaces."

The disagreements between Monotype and ITC escalated. Monotype claimed ITC disrupted Monotype's relationship with its customers causing concerns about possible liabilities that could arise if the particular Monotype products were used without ITC licensing. Monotype then brought this case alleging seven causes of action seeking injunctive, declaratory relief and damages.

The case was bifurcated for jury trial. Phase One dealt only with the issue of whether or not Monotype had breached its subscriber agreement. Monotype offered the testimony of Robin Nicholas, the typographic origination manager for Monotype. He testified that the nine typefaces involved could all be traced back to their early origins and subsequent induction in Monotype's library long before the creation of ITC.[4] ITC

argues that the Subscriber Agreement clearly forbid Monotype from offering a "version" of an ITC typeface. Its position is that the word "version" has a broad meaning and prohibits a similar typeface to that of an ITC typeface, rather than a mere style variation. Thus, ITC argues that the Monotype typefaces were "versions" of the ITC 10 and "equivalent" to each other. Monotype denied the ITC interpretation. The jury, in a special interrogatory constituting its verdict, answered "No" to whether or not Monotype had breached the agreement.

The trial court entered judgment in favor of Monotype and enjoined ITC from communicating to others that Monotype was using copies of ITC typefaces. The court then ruled as a matter of law on the remaining counts. Those issues and the appeals and cross-appeals that followed will be examined as part of Phase II.

## PHASE I

In this phase we examine the jury trial issues which generally involve admission of evidence, instructions, court imposed limitation on the length of the trial, and the relief granted to Monotype.

### A. Evidentiary Rulings

■ "Evidentiary rulings by a district court are not reversible absent clear abuse of discretion." *McGonigle v. Combs,* 968 F.2d 810, 818 n. 6 (9th Cir.1992) (citing *Jauregui v. City of Glendale,* 852 F.2d 1128, 1132 (9th Cir.1988)). A district court's Rule 403[5] ruling is reviewed for an abuse of discretion, and will not be reversed absent a showing of prejudice. *Larez v. City of Los Angeles,* 946 F.2d 630, 638 (9th Cir.1991).

---

4. In detail Mr. Nicholas testified that the ITC Avant Garde typeface is a geometric sans serif typeface. Mr. Nicholas stated that Monotype has had a geometric sans serif in their library since the 1930's known as "Twentieth Century." This was released as "Century Gothic." Nicholas also testified that the Bookman typeface was originally called "Old Style Antique" and had been traced back to a Scottish foundry around 1860. Patricia Saunders, a senior designer at Monotype, created "Corsiva" from a variety of typefaces from the Monotype library. The typeface is based upon 15th and 16th Century calligraphic designs from Rome and Venice. In fact,

Ms. Saunders' research and work done on creating Corsiva was televised on the BBC program, *Landmarks.* Corsiva is similar to the ITC typeface Zapf Chancery.

5. Federal Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

ITC states that under *United States v. Smith* a *de novo* standard of review is appropriate. *United States v. Smith*, 924 F.2d 889 (9th Cir.1991). ITC, however, misreads the holding. That court held that a district court's construction of the Federal Rules of Evidence was subject to *de novo* review, but the questions of admissibility involve factual determinations, and thus are reviewed for an abuse of discretion. *Id.* at 895.

The district court rejected three pieces of evidence introduced by ITC: (1) The Berlow Report; (2) The Norton Report; and (3) The Dennis Adler E-mail.

### (1) The Berlow Report

■ The Berlow Report is a single-page document prepared by David Berlow, a principal of Font Bureau, a company that specializes in the design and production of digital typefaces for computer formats. Berlow had a relationship with ITC while Monotype was developing its typefaces. In September 1991, Berlow was retained by Microsoft for the purpose of assisting in the conversion into computer format of certain typefaces developed by Monotype.

ITC's Vice President contacted Berlow and told him that Monotype had made copies of ITC's typefaces. Subsequently Berlow contacted Steve Shaiman of Microsoft by E-mail and stated he had "finally determined for certain that some of the faces that we are being asked to work on, are not legitimate versions." Berlow then expressed his opinion that Monotype had copied the ITC typefaces. Berlow testified that the Monotype typefaces had the same width metrics as the ITC, were "functional equivalents," and violated the "code moral" of ATypeI, a typographical trade association. At trial, ITC first argued this report was an admission by a party-opponent, but ITC could not prove Berlow was an agent for Monotype. Then ITC argued that it was a memorandum that should fall within the business records exception. The district court held, however, that the Berlow report could not be admitted under Rule 403. First, the court explained Berlow's opinion was based on a moral code of the industry and his own beliefs as to certain typefaces. The court therefore held that this did not represent a useable standard for opinion testimony which would assist the jury. Second, when Berlow made his initial statement that the Monotype typefaces were copies, he had never seen the actual Monotype typefaces. The court held that even if the report did have relevance, it would be prejudicial and would confuse the jury.

It does not appear that the district court abused its discretion in excluding the Berlow report. Berlow's opinions have little basis when made without an actual comparison. Further, Berlow's statement that Monotype's conduct violates a typographical association's moral code, not part of the agreement, would only confuse the jury. Berlow was not testifying as an expert and the jury might also give the association's code too much weight for what it represented. The district court therefore did not abuse its discretion in excluding the Berlow report under Rule 403.

### (2) The Norton Report

■ Norton was a typographical engineer who worked for Microsoft from March to October 1991 as a consultant to review the work Monotype was doing for Microsoft. On October 29, 1991, he prepared a three-page document in which he expressed his views as to the similarities and differences between the typefaces. Norton testified the report was unsolicited by Microsoft and that he did not retain a copy of it for himself. At the time he wrote the memorandum he had neither seen the ITC–Monotype agreement nor did he have any knowledge the agreement might have been breached.

■ ITC argues the Norton report should be admitted under the business record exception to the hearsay Rule 803(6).[6] The flaw in ITC's argument is that the Norton report is

---

**6.** In the Ninth Circuit, a business record is admissible when (1) it is made or based on information transmitted by a person with knowledge at or near the time of the transaction; (2) in the ordinary course of business; and (3) is trustworthy, with neither the source of information nor method or circumstances of preparation indicating a lack of trustworthiness. *United States v. Bonallo*, 858 F.2d 1427, 1435 (9th Cir.1988).

not the type of report Microsoft was in the practice of making in the regular course of its business. The district court therefore held it was not admissible. The court found that the witness, Norton, expressed some "off-hand impression" that he put on paper for the review of a few people. That, the court held, did not make it a business record for the purposes of the rule.

■ ITC also argues the report constituted an admission by a party's agent concerning a matter within the scope of the agency under Rule 801(d)(2). Monotype answers that ITC waived this argument because at trial ITC's counsel conceded the Norton report was not an admission by Monotype. ITC refutes this by stating that ITC counsel argued that the Norton report should be admitted not as a direct admission by Monotype, but as the admission of a co-participant in an overall business plan. This adoptive admission argument appears to be no more than a last effort to get the report admitted. It is difficult to conceive how a person hired by Microsoft to review Monotype could thereby be constituted as an agent of Monotype.

The district court did not abuse its discretion in excluding the Norton report from evidence.

### (3) The Adler E-mail

■ Dennis Adler, an employee of Microsoft, received an E-mail transmission October 21, 1991, from David Berlow. This was the same E-mail mentioned earlier in which Berlow stated he had "finally determined for certain that some of the faces that we are being asked to work on, are not legitimate versions." The next day, Adler prepared an E-mail message to another Microsoft employee concerning ITC's charges of typeface copying. In this message, Adler urged caution and expressed a highly derogatory and offensive description of Monotype's type director, Rene Kerfante.

ITC claims this E-mail transmission should have been admitted as a business record because Adler was knowledgeable about the Microsoft–Monotype transaction, was writing the E-mail to his superior, and the record was kept in the course of regularly conducted business.

The district court rejected ITC's arguments and granted Monotype's motion *in limine* to exclude Adler's E-mail. The court ruled it was inadmissible under Rule 403 because the prejudicial nature of the evidence outweighed any of its relevancy. Because of the nature of the derogatory remarks, the district court was correct in excluding the Adler E-mail. ITC still, however, maintains that the E-mail memo should be admitted under the business record exception. ITC argues that an E-mail to a superior at Microsoft is kept in the regular course of business.

ITC supports this argument with *United States v. Catabran*, 836 F.2d 453 (9th Cir. 1988). Under *Catabran*, the Ninth Circuit held that computer printouts were admissible under the 803(6) business exception once a proper foundation had been laid. *Id.* at 457. The computer printouts involved were printouts of bookkeeping records that were entered into the computer on a monthly basis. *Id.* The difference between *Catabran* and the present case is that E-mail is far less of a systematic business activity than a monthly inventory printout. E-mail is an ongoing electronic message and retrieval system whereas an electronic inventory recording system is a regular, systematic function of a bookkeeper prepared in the course of business.

The district court properly excluded the Adler E-mail transmission.

We find no evidentiary errors.

### B. Trial Time Limits

■ The imposition of time limits, a factor that goes to the fairness of the trial, is reviewed for an abuse of discretion. *Hansen v. Commissioner*, 820 F.2d 1464, 1467 (9th Cir.1987). "Trial courts have discretion to place reasonable limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence." *Johnson v. Ashby*, 808 F.2d 676, 678 (8th Cir.1987). Courts have, however, disapproved of rigid hour limits on trials.

*See Flaminio v. Honda Motor Co.,* 733 F.2d 463, 473 (7th Cir.1984).

■] At a pre-trial conference, the court inquired how long the trial would take. ITC responded that it would need three weeks. The district court bifurcated the trial, allowed seven days for trial, and divided the time equally among the parties. The court's order provided that "any party may apply at trial for relief from this order for good cause." On December 7, 1992, ITC asked the judge for more time to present its case. The court amended the schedule to nine days.

ITC contends that it had to carry the burden in explaining the background of the typeface industry and the marketing of typefaces. ITC therefore argues it needed more time to make such a presentation so the jury could understand the case. ITC states the time limitation forced it to restrict its presentation and delete the testimony of ITC's Vice President. ITC did object to the trial limitation, but it did not argue how it was damaged by the time limits, nor state what additional time was needed. A crowded docket does not justify an infringement on the right to reasonably develop a case; however, the objecting party must show there was harm incurred as a result. Monotype asserts ITC had ample opportunity to request additional time, but did not do so. ITC responds that the judge's comments discouraged the request. The better place for ITC to make the time argument, however, was there, not here.

We find no abuse of discretion.

## C. Instruction

■ "Whether a jury instruction misstates the elements that must be proved at trial is a question of law that is reviewed de novo." *Caballero v. City of Concord,* 956 F.2d 204, 206 (9th Cir.1992) (citing *United States v. Spillone,* 879 F.2d 514, 525 (9th Cir.1989), *cert. denied,* 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990)). A litigant is entitled to an instruction concerning its theory of the case if it is supported by evidence and law. ITC argues that the district court erred in refusing to instruct on an

implied covenant of good faith and fair dealing which ITC sees implicitly contained in the Subscriber Agreement. ITC states that every contract has an implied obligation that neither party will act to injure the other party's right to receive the fruits of the contract. ITC finds the basis of this legal principle in *Wakefield v. Northern Telecom, Inc,* 769 F.2d 109 (2d Cir.1985).[7] In *Wakefield,* the court acknowledged that "[i]mplied contract provisions may coexist with express conditions which seemingly negate them where common expectations or the relationship of the parties as structured by the contract so dictate." *Id.* at 112. *Wakefield* involved a dispute concerning a commission agreement. *Id.* at 110. Wakefield was an employee who was fired when the company he worked for, Danray, Inc., was acquired by Northern Telecom, Inc. ("NTI"). *Id.* Wakefield brought a contract claim against NTI alleging he was denied commissions for sales performed before his termination. Wakefield argued that he was fired because NTI wanted to avoid paying him those commissions. *Id.* at 111–12. He contended that under New York law a termination so motivated violated an implied covenant of good faith and fair dealing of his commission agreement. *Id.* at 112.

The jury found for Wakefield. *Id.* at 110. The Court of Appeals held an implied covenant of good faith is not ordinarily applicable to an at-will agreement comparable to the one Wakefield had; however, where a covenant of good faith is necessary to enable one party to receive the benefits promised for performance, it is implied in law to effectuate the intent of the parties. *Id.* at 112. The court implied a covenant of good faith into the Wakefield commission agreement because an unfettered right to avoid payment of commissions would be counterproductive to the purpose of the contract itself. *Id.* at 112–13. Thus, under *Wakefield,* ITC contends an implied covenant of good faith is permitted under New York law and should be read into the Subscriber Agreement between Monotype and ITC.

Monotype responds that the Agreement between them, quoted above, contains ex-

---

**7.** It is conceded that New York law governs the present case.

press provisions proscribing certain conduct; thus where the parties have expressly and specifically defined what conduct is prohibited, broader language cannot be implied. Monotype argues that ITC, by attempting to invoke an implied covenant of good faith, is seeking to have the court create an additional benefit for which ITC did not bargain. *See Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F.Supp. 1504, 1519 (S.D.N.Y.1989). In *Metropolitan Life,* the court was asked to imply a covenant of good faith into an indenture agreement. *Id.* at 1516. The court stated that under New York law such a covenant is implied only when consistent with the other express terms of the agreement. *Id.* at 1517. In other words, the implied covenant would aid the explicit terms of the agreement, and not impose an obligation inconsistent with those terms. *Id.* The implied covenant is "breached only when one party seeks to prevent the contract's performance or to withhold its benefits." *Id.*

In *Harris Trust & Savings Bank v. E–II Holdings. Inc.,* 926 F.2d 636 (7th Cir.1991), the court held that although under New York law a covenant of good faith may be implied, it may only be invoked in those instances where one party has violated the spirit, and not the letter, of a contract. *Id.* at 642. The court agreed with the district court in *Metropolitan Life,* that the relevant investment contract did not support the interpretation offered by implying a good faith covenant. *Id.* at 643–44. New York law restricts the application of an implied good faith covenant. Monotype asserts this is such a case because ITC seeks an additional benefit by implication.

Further, Monotype argues that ITC's reliance on *Wakefield* is misplaced. In *Gallagher v. Lambert,* the New York Court of Appeals dismissed the plaintiff's argument that the contract could allow for an implied covenant of "fair value" in a buy-back for employee stock. *Gallagher v. Lambert,* 74 N.Y.2d 562, 549 N.Y.S.2d 945, 947, 549 N.E.2d 136, 138 (1989). The court stated

that implying those principles into the contract would frustrate the agreement, and would be disruptive of settled contract principles governing like agreements whereby parties contract in advance for predictability, reliance, and definiteness. *Id.* The Gallagher court ignored the *Wakefield* case and affirmed New York's strong at-will employment rule. *Id.* Later, the district court in *Collins & Aikman Floor Coverings v. Froehlich* held that the *Gallagher* case is the latest reiteration of New York's view of this basic contract principle. *Collins & Aikman Floor Coverings v. Froehlich,* 736 F.Supp. 480, 486 (S.D.N.Y.1990). The court found the majority in *Gallagher* had rejected *Wakefield,* and any reliance on it would be unwarranted because *Wakefield* had cited no New York law in developing its exception to the strict at-will employment rule. *Id.* at 485. Monotype reads these later opinions to mean that New York has now rejected *Wakefield* and therefore the good faith covenant should not be implied. Monotype argues that the jury determined that Monotype's conduct was not inconsistent with the intent of the parties expressed in the agreement; thus any verdict in favor of ITC on an implied covenant would be inconsistent with the intent of the parties and the jury verdict.

The jury was asked to determine what the parties intended when they entered into the Agreement and then to decide whether Monotype's conduct was contrary to that intent.[8] ITC argued that the contract was meant to prohibit the marketing of commercial substitutes, but the jury's verdict entailed a finding that it believed the parties did not intend to go that far. The district court essentially agreed with Monotype; "the established rule of an implied covenant of good faith and fair dealing does not permit a Court to supply additional terms for which the parties did not bargain.... It would have been an error to submit a separate theory of good faith and fair dealing, where the only answer that could favor ITC would be one that conflicted with the jury's finding."

---

8. Instruction No. 16 states in pertinent part:
 If the intention of the parties cannot be determined considering the factors listed above, and if the contract was written by one party, any ambiguity should be resolved against the party who wrote the contract in favor of the party who took part in selecting the ambiguous language.

The district court was correct in rejecting ITC's instruction for an implied covenant of good faith and fair dealing. Under New York law, or any other jurisdiction, an implied covenant theory does not give a court permission to supply additional terms to a contract for which the parties have not bargained.

### D. Breadth of the Judgment

 In its judgment the district court included seven additional Monotype families for protection. That inclusion ITC argues was manifestly unfair, highly prejudicial to ITC, and contrary to the court's *in limine* and pretrial order. The Monotype families at issue at trial were Monotype Century Gothic, Bookman Old Style, and Monotype Corsiva. The judgment, however, includes others and decrees:

Monotype's creation of the following typeface

families does not violate any agreement between Monotype and ITC, and does not constitute an offering of any ITC typeface, or weight or version or copy thereof: Century Gothic, Bookman Old Style, Monotype Corsiva, Monotype Sorts, Monotype Baskerville, Monotype Century, Monotype Clearface, Monotype Garamond, Glouester Old Style, and Monotype Modern (hereinafter collectively the "Monotype typefaces").

Monotype argues that ITC made these additional families an issue itself by bringing them in through an answer to an interrogatory.[9] No evidence was introduced at trial as to whether these Monotype typefaces were weights or versions of ITC typefaces. ITC moved for the court to reconsider its inclusion of these Monotype families in the judgment. The court ruled that these typefaces were within the scope of ITC's counterclaim for breach of contract and thus could be included in the judgment. ITC had claimed in interrogatories and other pretrial proceedings that these additional families were impermissible copies. Further, the court noted that nothing in the order barred ITC from litigating these typefaces.

The district court did not abuse its discretion in adjudicating the status of the extra Monotype typeface families. Although the issue was not expressly litigated, ITC did set out that these families were also alleged copies of ITC typefaces. ITC had the right and the forum to litigate these issues, but declined to do so. It was only a procedural matter of organization and thoroughness to render judgment on all issues brought before the court. We find no error.

 In a related issue ITC contends that its "Zapf Dingbats," a collection of its typographical symbols, was not an issue at trial. Therefore, it was an error for the court to require ITC to bring a compulsory counterclaim in regards to the Zapf Dingbats.

Monotype "Sorts" is the competitive version of ITC's Zapf Dingbats. Zapf Dingbats was mentioned as one of the original ten in the ITC 10, the package that ITC required royalties to be paid for its distribution. Monotype claims that because it was part of the original ITC 10, Zapf Dingbats was clearly an issue in this litigation. Monotype argues ITC has throughout alluded to some copyright interest in Zapf Dingbats. ITC has stated that the issue in a Dingbats and Sorts conflict would involve the copyright laws of the United States and foreign countries; thus they argue it would be better resolved in a separate lawsuit.

---

9. The interrogatory at issue states:

INTERROGATORY NO. 4: Identify any and all typefaces currently or previously offered by Monotype that you contend are (a) "weights" or (b) "versions" of any typeface or typefaces currently or previously offered by ITC.

ANSWER: Note: This response by ITC is based on catalogs examined by ITC and assumes the definitions of these terms commonly used in the typeface industry.

Monotype offers, in addition to listed in response to Interrogatory No. 3 [4 weights of Century Gothic, 4 weights of Bookman Old Style, and Corsiva], many weights of ITC typefaces under license to it; it also offers versions of ITC typefaces in the following typeface families:

Monotype Baskerville
Monotype Century
Monotype Clearface
Monotype Garamond
Glouester Old Style
Monotype Modern

The district court ruled that any claim ITC had on its Zapf Dingbats was a compulsory claim that had to be brought at this time.[10] The district court did not abuse its discretion in ruling any claim concerning Zapf Dingbats was a compulsory counterclaim. ITC's original claim was based on its allegation that Monotype "copied" its core ten fonts. It was Monotype's licensing of its own competitive core fonts that gave rise to this litigation. It appears that ITC's claim that Sorts violated ITC's rights in Zapf Dingbats would be connected to the "transaction or occurrence that is the subject matter" of Monotype's claim.

### E. Injunction Granted

 Monotype sought an injunction due to certain erroneous and harmful communications ITC was sending out to customers and potential customers of Monotype. The injunction required ITC to refrain from communicating to third parties that Monotype typefaces are ITC typefaces or weights or versions thereof.

ITC refutes that claim on the grounds that the injunction was overbroad because it has no bounds geographically and interferes with ITC's First Amendment right of commercial speech. ITC's main contention is that because the court in Phase II, yet to be considered, found that Monotype had offered no evidence to show ITC acted in other than good faith, there is a question as to whether Monotype suffered any injury. Thus, it argues, if ITC was found to act in good faith, then there is no legal harm from which to enjoin because possible future harm is remote.

The injunction has no geographic bounds, and courts are generally reluctant to restrain conduct outside of their own territorial jurisdiction. See Wright & Miller, *Federal Practice and Procedure: Civil* 2945 (1973). Further, ITC argues that the typeface business is a world-wide business, and thus the injunction is unrestricted. ITC also contends the injunction violates its constitutional commercial speech right because it enjoins it from stating to others that essentially it should have won the case.

The court granted the injunction because it appeared ITC would continue to communicate to others that Monotype typefaces were copies of ITC typefaces, and Monotype would thereby suffer irreparable harm. Further, the court held that ITC's First Amendment right was not being impaired because it was a narrow injunction against specific commercial speech which the jury had determined was false.

The injunction is a narrow restraint on ITC's right to commercial speech that is justified by ITC's past actions and potential for future harm. Further, the district court was correct to adjudicate the typefaces because ITC initially brought the typefaces into the case through its interrogatories and pretrial proceedings. Thus, the district court did not abuse its discretion in granting the injunction and adjudicating the status of the additional Monotype typefaces.

### PHASE II

At the conclusion of Phase I the court granted Monotype's motion for judgment as a matter of law on ITC's trade dress infringement claim under Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a), and its unfair competition claim. The evidence received in Phase I was considered applicable to Phase II where relevant. ITC abandoned its claim for breach of contract related to the royalty payments allegedly due under the contract. These issues are not raised on appeal.

The Phase II claim raised here by ITC is the district court's dismissal of ITC's claim for tortious interference with its business expectancies by Monotype which had engaged in false advertising contrary to 43(a) of the Lanham Act, 15 U.S.C. 1125(a). In Phase II the district court satisfied neither party as on the same basis it also dismissed Monotype's analogous tortious interference claim against ITC.

---

**10.** Rule 13(a) provides that a pleading "shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim...." Fed. R.Civ.P. 13(a) (1994).

A court will review *de novo* the grant of a motion for judgment as a matter of law under Fed.R.Civ.P. 50(a). *Erickson v. Pierce County,* 960 F.2d 801, 804 (9th Cir. 1992). The evidence is to be reviewed "in the light most favorable to the nonmoving party and draw all possible inferences in favor of that party." *Ellison v. Shell Oil Co.,* 882 F.2d 349, 352 (9th Cir.1989) (quoting *Donoghue v. County of Orange,* 848 F.2d 926, 932 (9th Cir.1987)).

The court dismissed ITC's claim of tortious interference because the evidence showed no interference for an improper purpose or by an improper means with a contractual or potential contractual relation. ITC asserts, however, that Monotype used improper means because the ITC–Monotype relationship was a fiduciary relationship.

ITC claims that under the generally accepted criteria of tortious interference, ITC has met all five elements.[11] ITC's main contention comes under element four. ITC argues that Monotype used improper means to get the Microsoft contract because ITC and Monotype were in a fiduciary relationship, and Monotype took advantage of its position to the detriment of ITC.

ITC first argues Monotype was ITC's agent because Monotype was partially acting in its behalf during negotiations with Microsoft and this relationship created a fiduciary obligation as a matter of law. In *Dorsey v. Strand,* the court recognized that it is a well-settled rule that when one acts for another in contractual relations, he owes that person full disclosure of all the facts and cannot become the beneficiary of the contract. *Dorsey v. Strand,* 21 Wash.2d 217, 226, 150 P.2d 702, 706 (1944). ITC is asserting that Monotype owed ITC a duty of full disclosure and breached its fiduciary duty when it abandoned its role of negotiating on ITC's behalf for the Microsoft contract.

ITC also claims that even if the court finds Monotype was not an agent of ITC but rather a competitor, Monotype is still liable. The status of a competitor does not grant "an unfettered hand in the market place." *Island Air, Inc. v. Les LaBar,* 18 Wash.App. 129, 141, 566 P.2d 972 (1977). The character of the defendant is the determinant as to whether interference has been improper. Restatement (Second) Torts 766 cmt b (1979). ITC contends Monotype used several improper means which demonstrated tortious interference of ITC's business relations. Some of the improper means included: misuse of confidential information, suppressing conflict of interest, and offering a better bargain without disclosure.

Monotype responds that ITC's current theories of tortious interference were never pled, set forth in the pretrial order, nor presented to the judge or jury. Thus, because these issues were never tried, Monotype asserts they are not proper for review. In *Wagner v. Retail Credit Co.,* 338 F.2d 598 (7th Cir.1964), the court held that the defendant may not be permitted to shift his theory after it arrives to this court. *Id.* at 601–02.

First, Monotype is not an agent of ITC. The Subscriber Agreement was an arms-length agreement between two separate parties intended to be of benefit to each. It would be inconsistent to hold that Monotype is an agent who breached its fiduciary duty when the jury found Monotype acted properly within the guidelines of the contract. Further, it cannot be implied from the facts that Monotype is ITC's agent. Monotype appears to have kept ITC abreast of the negotiations going on between Monotype and Microsoft. Monotype had no fiduciary duty to complete negotiations for ITC. If there is no evidence Monotype is an agent, then no fiduciary duty is owed, and the rule in *Dorsey* is inapplicable.

11. The elements of tortious interference are as follows:

 (1) the existence of a valid business expectancy;

 (2) that defendants had knowledge of that relationship;

 (3) an intentional interference inducing or causing a breach or termination of the expectancy;

 (4) that defendant interfered for an improper purpose or used improper means; and

 (5) resultant damages.

Restatement (Second) of Torts § 766(B) (1979).

ITC's second argument that Monotype used improper means as a competitor is unavailing as well. Monotype acted within the constraints of what it really is—a competitor. Monotype developed a line of typefaces that was in competition with what ITC had to offer. It is said that "free competition is worth more to society than it costs." *Vegelahn v. Guntner,* 167 Mass. 92, 44 N.E. 1077, 1080 (1896). The jury found Monotype's actions to be within the contract, which is more restraining than the competitive marketplace itself.

 The district court did not err in directing a verdict against ITC in its claim that ITC tortiously interfered with the business relationships.

The same rules likewise apply to Monotype's tortious interference claims against ITC which the court also dismissed. In September 1991, word had spread that Microsoft had awarded Monotype the remaining twenty-two types. Monotype then notified ITC that Monotype had licensed competitive typefaces to Microsoft. ITC responded with a complete audit of Monotype's business. The audit was to be performed in November 1991 at the Monotype offices located in England. Before the audit, Monotype was receiving telephone calls from customers stating that ITC was telling them Monotype was selling copies of ITC typefaces. Prior to the audit ITC sent out fifteen letters to key companies.[12] Monotype asserts the issue really turns on the fact the court failed to view its evidence in a light most favorable to Monotype. Monotype contends that if the court had done so, the evidence in the record would have demonstrated that ITC acted in bad faith.

The district court held that reasonable people could differ over ITC's interpretation of the contract that similar typefaces could not be offered by Monotype consistent with the agreement. The court stated the law

allows a party "the right to communicate to others its position as to a contractual dispute in order to protect its claimed rights as long as it does so in good faith." To hold otherwise would stifle protected commercial speech. Further, the court held that although the October ITC letter carried the threat of a potential suit against all those that bought the Monotype "copies" of ITC typefaces, ITC did have a position to protect. Finding no improper means or purpose, the court dismissed Monotype's tortious interference claim.

The district court did not err in dismissing Monotype's claim of tortious interference. Monotype cites very little authority to support its position. The district court viewed all evidence in favor of Monotype and addressed each of its arguments.

Both ITC and Monotype are companies in a highly competitive industry. Competitive efforts and improper means may at times walk a fine line, but it cannot be said the court erred in dismissing either Monotype's claim or ITC's claim.

## CONCLUSION

We find no error in any of the issues raised by the parties and affirm the district court in all respects. The parties shall bear their own costs.

---

12. The letter stated that subscribers may only offer ITC typefaces under the ITC name, and offering these typefaces under another name or accepting the substitutions would be interfering with ITC's contractual rights. Further, the letter explained that ITC was looking into to what extent Monotype was not complying with the Agreement. The letter was excluded from evidence under Fed.R.Evid. 408 on the grounds it was a settlement document.